**Robert J. TOPPI**

v.

**UNITED STATES of America.**

**Civ. A. No. 42034.**

United States District Court,
E. D. Pennsylvania.

Oct. 5, 1971.

Gary C. Leedes, Esq. Richter, Syken, Ross, Binder & O'Neill, Philadelphia, Pa., for plaintiff.

Edwin E. Naythons, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

The plaintiff filed suit under the Federal Tort Claims Act, 28 U.S.C.A. § 2671 et seq. (1965), alleging numerous theories as the basis for the cause of action. In May of 1971 this Court denied the defendant's motion for summary judgment holding that the facts as alleged by the plaintiff could establish a cause of action. Toppi v. United States, 327 F. Supp. 1277 (E.D.Pa.1971). The case was tried without a jury on the question of liability. The testimony was conflicting on practically every point except the fact that plaintiff was injured by an explosion while in the process of disposing of certain pyrotechnical chemicals. Emphasizing the requirement that the plaintiff prove his case by a preponderance of the evidence, I make the following findings of fact.

## FINDINGS OF FACT

1. Plaintiff was, on April 23, 1965, a safety engineer for Thiokol Chemical Corporation (Thiokol) at its plant in Bristol, Pennsylvania. He had approximately thirteen years' experience in industrial safety, of which the last three and a half months had been as a Thiokol employee. His total experience in handling and destroying explosives consisted of "learning explosives" on his job at Thiokol for about a month and a half prior to April 23, 1965.

2. Max Stuckey was plaintiff's direct and immediate supervisor, and in charge of overall safety at the Bristol plant. On the Monday preceding April 23, 1965, Mr. Stuckey telephoned to plaintiff from Elkton, Maryland. From that conversation, Mr. Stuckey ascertained the limited experience that plaintiff had with explosives, and as a result expressly directed plaintiff to do nothing with any explosives until he, Mr. Stuckey, could personally talk with plaintiff. Mr. Stuckey never countermanded his instructions to plaintiff.

3. Subsequent to the telephone conversation between plaintiff and Mr. Stuckey, one of the production supervisors, Mr. Hearne, requested plaintiff to dispose of pyrotechnical chemicals on April 23, 1965, by a burning process to be conducted in an open "burning field" on Thiokol premises.

4. The chemicals to be disposed of consisted of B–73, Boron and Tetryl. B–73 was light charcoal gray in color, metallic in texture, and in particles approximately one-fourth of an inch by one-eighth of an inch. The tetryl, which was far more explosive than B–73, was mixed with graphite and formed into particles that were circular in shape approximately two and a half inches in diameter by one-half inch in thickness, thereby having a different physical appearance from B–73. In color the tetryl mixed with graphite was almost black.

5. Plaintiff because of his lack of experience and fully recognizing the dangerously explosive propensities of the materials to be destroyed, was apprehensive about conducting the burning process without the assistance of someone more adequately experienced. Nevertheless, on April 23, 1965, plaintiff, along with William Schmidheiser, an employee of the production department of Thiokol, proceeded to the burning field to dispose of the materials.

6. Plaintiff and Mr. Schmidheiser proceeded to dispose of the materials by burning on the corporate burning site. One train of material was laid out, ignited and burned without incident. (A train consisted of spreading the material to be burned in a thin line on the field.) While a second train was being laid by both Schmidheiser and plaintiff, the train caught fire and proceeded to the point where plaintiff was laying the train where it exploded causing plaintiff serious personal injuries. The material that exploded was tetryl that was mistakenly either being laid in the train or left in the immediate vicinity.

7. The tetryl had been purchased by Thiokol from the United States. It was entirely the property of Thiokol and under Thiokol's exclusive ownership, possession and control.

8. The tetryl was not defective at any time, although it may have been mixed with B–73 by Thiokol employees. Its highly explosive propensities were known and fully appreciated by both Thiokol and plaintiff.

9. Thiokol was a subcontractor of Maxson Electronics Corporation, which latter corporation held a government contract to make certain pyrotechnical boosters. The government inspector, Edward B. Austin, was assigned to the Thiokol plant in Bristol, Pennsylvania, for the purpose of "setting up a quality system" in order to verify that the subcontractor, Thiokol, was meeting all of the requirements and specifications of the product it was manufacturing, which consisted of "end-item verification and shipment." As the government inspector, Mr. Austin had no control, supervision, or training responsibilities as to Thiokol or its employees. He had no responsibility to conduct or observe the destruction of any of the chemicals at the burning site, and he never promised, requested, nor actually undertook to conduct or observe the disposal of tetryl for either his governmental supervisors, Thiokol or any of its employees.

## FACTUAL ISSUES

Serious conflicts in testimony left many factual issues in serious contention. The plaintiff initially claimed that the government remained the owner of the tetryl, that it was classified as government supplied material, and that as such could not be destroyed unless a government inspector was present for so doing. The plaintiff, however, in his proposed conclusions of law has now requested this Court to find that the tetryl that was burned by the plaintiff on April 23, 1965, was purchased by Thiokol from the United States; that title thereby passed to Thiokol and that the United States reserved no interest in or control over it after the passage of title. The Court agrees that this is the appropriate finding.

It was shown by careful documentation that the tetryl was purchased for cash from the government, and shipped from government warehouses in Crane, Indiana, to the Bristol plant of Thiokol. Since the government had no interest in the tetryl as such after its shipment, any excess tetryl could be destroyed by Thiokol or used in any lawful way without government consent or supervision.

At trial the present major thrust of plaintiff's position was that he had telephoned to the government inspectors at Thiokol, seeking advise and assistance in destroying the tetryl, and had been misled by the information received. Since the fact finder has not found that the telephone call was made, some detail of the testimony is appropriate. Plaintiff testified that after he was advised by the production department of Thiokol that Boron, B–73 and tetryl were scheduled for destruction, he telephoned Ed Austin's office (the government inspector at Thiokol), because he knew Mr. Austin had the expertise to assist him. Plaintiff stated on direct examination that "I called and I asked for Ed Austin and Ed Austin wasn't there. And I spoke with Curt Prevost." (T.R. 28). According to plaintiff he told Mr. Prevost that he, plaintiff, was assigned to destroy B–73 and tetryl, that he was going alone and that he expected someone from Mr. Austin's department to come and assist him. Receiving no reply, he telephoned again on the morning of the scheduled disposal. The trial record discloses the following testimony on plaintiff's direct testimony:

"Q. And who did you speak to and what did you say?

"A. Well, Curt Prevost—I spoke to Curt again and I said, 'Look, Curt, I have to go down to the burning site, the arrangements have been made, right after coffee break about 10:00 o'clock.'

"I said, 'Now, I want someone to come down with me.' I said, 'Can I expect you down?'

"He said, 'Sure.'

"I said, 'I can't start doing anything until you come so don't hold us up.'

"And he said, 'Sure, you can.' He said, 'You don't have all government material.' He said, 'Burn the B–73.'

"So I said, 'Well, how do I know the difference between the B–73 and the government supplied material?'

"He said, 'Well, Tetryl is a yellow.' He said, 'Just don't burn the yellow stuff.'" (T.R. 29.)

Plaintiff asserts that this conversation was between himself and a governmental employee, that it was misleading to him and resulted in his injuries.

The defense produced Mr. Prevost as a witness.[1] He testified that he was working elsewhere on April 23, 1965, and never worked at and was never assigned to Thiokol until the end of November, 1966. This was substantiated by documentary evidence and corroborated by another witness, Mr. Austin. In rebuttal, the plaintiff insisted that he "certainly spoke with someone from the Government office because we had a discussion."

Plaintiff's brief strongly urges the fact finder to adopt the position that the plaintiff had the verbatim discussion set forth in the trial record, but that it was with some other unidentified governmental employee. In refusing to so do, the fact finder notes that on direct examination, plaintiff made unequivocal assertions concerning all of the details of the alleged conversations including addressing the recipient of the call as "Curt." Plaintiff testified that he had two telephone calls to Curt Prevost. His

later qualification that he had these conversations with some government employee is wholly unconvincing, especially since Mr. Austin, the government employee in charge testified that he neither received nor was advised concerning any such telephone call. Further doubt as to plaintiff's credibility is his "lack of recollection" of the telephone call from Mr. Stuckey, his superior, that he should not attempt to dispose of any explosive material until they had a meeting. Mr. Stuckey's testimony is clear and concise on this point and not questioned by plaintiff except for his "do not remember" answers. Therefore, the fact finder concludes that the phone call to the government inspector's office was never made, and the plaintiff was not given any advice or assistance by the government inspectors in destroying tetryl.

## THEORIES OF LIABILITY

Before discussing the various theories propounded by the plaintiff in this case, it must be noted that many diverse theories of liability have been brought before this Court. Some theories originally mentioned in the pleadings were never seriously argued or were abandoned at trial, while others were introduced for the first time in plaintiff's proposed conclusions of law. In plaintiff's proposed conclusions of law, he has based his conclusion of liability upon Section 402A, Sections 324A and 323, and Section 410 of the Restatement (Second) of Torts (1965). In order that it will not appear that this Court has overlooked any vital theory of liability, they will all be examined, as well as other suggested sections of the Restatement.

■ The plaintiff argues that he has met his burden by a preponderance of evidence under any one of several theories

---

1. Although plaintiff objected to Mr. Prevost's testifying because he was not listed in the pretrial memorandum, the Court permitted Mr. Prevost to testify. It is clear that plaintiff's counsel was aware that he was a potential witness from the content of Mr. Toppi's testimony at trial. From the government's standpoint, the contention as to the alleged

phone conversation was never revealed pretrial and was a complete surprise. In fact, the entire theory of liability in plaintiff's pretrial memoranda was completely different from that submitted at trial. Both parties failed to take adequate discovery, the result being that neither was completely aware of the contentions and defenses of the other.

of law. He foremostly relies on this Court's opinion denying the defendant's motion for summary judgment, 327 F. Supp. 1277, 1279 (E.D.Pa.1971), where I noted that a cause of action was established by the pleadings under the Restatement (Second) of Torts § 324A (1965). After finding the facts in this case, it is clearly apparent that a cause of action is not viable under that section. Section 324A states:

"Liability to Third Person for Negligent Performance of Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Plaintiff has failed to sustain his burden of proof by establishing that the government was obligated to or gratuitously agreed to render services or actually did render services to Thiokol in the nature of safety control or the inspection or supervision of the destruction of the tetryl owned by Thiokol. It is not necessary to proceed any further with an analysis of this section since the undertaking to render services is fundamental to a cause of action under § 324A.

The plaintiff has also failed to make out a cause of action under Restatement (Second) of Torts § 323 (1965) which involves a gratuitous rendering of services to protect another person which services are carried out in a negligent manner. Plaintiff failed to prove that inspection of the disposal of the explosives was actually undertaken by the government. This would negate liability under § 323. Brown v. T. W. Phillips Gas and Oil Co., 195 F.2d 643 (3rd Cir. 1952). In addition, plaintiff failed to prove a governmental promise to inspect on this occasion made to plaintiff.

The plaintiff has failed to make out a cause of action under Section 388 and Section 391 of the Restatement (Second) of Torts (1965). These sections hold a supplier of a chattel with a dangerous propensity in the particular use for which it is intended liable for injury to anyone the supplier would expect to use the chattel, and who the supplier did not warn of the danger. However, it is required that the supplier have "no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." In this case both Thiokol and Mr. Toppi well knew and appreciated the dangerous explosive potential of tetryl during the disposal process. In addition, the plaintiff submitted no evidence indicating that the government failed to extend the required warnings.

The plaintiff in the amended complaint generally alleges that the tetryl sold by the government to Thiokol was defective, violating express and implied warranties. It is clear that the plaintiff has not met his burden of proving a cause of action under Pa.Stat. tit. 12A, § 2–313 (Express Warranty), § 2–314 (Implied Warranty of Merchantability), and § 2–315 (Implied Warranty of Fitness for a Particular Purpose) (1970). No evidence was submitted by the plaintiff on the existence of such warranties or on any defect in the tetryl, and none is apparent from the testimony. Therefore, this Court is left with no alternative but to hold that there was no warranty protection and that even if such protection did exist, the tetryl was not defective.

The same failure to submit evidence by plaintiff requires a denial of recovery under the Restatement (Second) of Torts § 402A (1965). No evidence of any defect in the tetryl was produced during the trial of this case, and a product

must be defective for Section 402A to be applicable. The plaintiff's reference to Comment k under Section 402A, in his proposed conclusions of law (item 6), is misplaced. He contends that I should find liability under Section 402A where an inherently dangerous product is supplied to a user without proper warnings. Comment k clearly indicates that there is liability under § 402A only where the inherently dangerous product is defective. Plaintiff's contention more properly belongs under Sections 389 and 391. However, under the facts as I have found them, as stated previously, there is no liability established per these sections.

■■ In a recent letter the plaintiff has urged this Court make new law to the effect that a seller of dangerous chattels should be held strictly liable for injuries resulting from his product even where the product is not defective and the buyer or user of the product is fully aware of the dangerous propensities of the product. This Court is not aware of any Pennsylvania law supporting this theory of liability, and this Court rejects it as a basis for grounding a cause of action. Were this Court to rule otherwise, all sellers of dangerous products would be insurers for any injuries resulting from them. Should Pennsylvania deem such an approach appropriate, it may do so, but I deem it inappropriate for Federal Courts, sitting in diversity actions, to alter the established law of the State. Judge Higginbotham of this district recently quoted the language of the Honorable Learned Hand on the impropriety of a lower court altering settled law.

> " 'Nor is it desirable for a lower court to embrace the exhilerating opportunity of anticipating a doctrine in the womb of time, but whose birth is distant.' Spector Motor Service v. Walsh, 139 F.2d 809, 923 (2nd Cir., 1944), vacated 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944)." Dugas v. National Aircraft Corporation, 310 F. Supp. 21, 28 (E.D.Pa.1970).

This theory of liability is, therefore, rejected.

■ In addition, as the defendant correctly points out, the Federal Tort Claims Act only lifts governmental immunity for negligent or wrongful acts committed by the government and not for theories of liability without fault, such as Section 402A, based on absolute liability, extrahazardous activities, inherently dangerous commodities, products liability, or warranties. Dalehite et al. v. United States, 346 U.S. 15, 44–45, 73 S.Ct. 956, 97 L.Ed. 1427 (1954); United States v. Page, 350 F.2d 28 (10th Cir. 1965) (see cases cited at p. 33), cert. denied, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966).

■ The plaintiff's most recent contention is that he has established a cause of action under Section 410 of the Restatement (Second) of Torts (1965). Under that section an employer of an independent contractor is subject to the same liability as the contractor for physical harm caused by an act or omission committed by the contractor pursuant to orders or direction negligently given by the employer himself. This section is clearly limited to an employer's liability, and in this case the government was not the employer of Mr. Toppi, Thiokol, or Maxson Electronics. The government was a purchaser from Maxson. The government merely provided quality inspectors to inspect the product Thiokol, as a subcontractor, was supplying to Maxson. In regard to tetryl, the government was merely a seller.

The plaintiff may be attempting to bring this case within the more general rule cited in § 410, Comment a, that "one who either intentionally or negligently directs another to do or omit to do an act, is subject to the same liability for the consequences of the other's act or omission as though it were his own." This theory fails because the fact finder has concluded that the government did not direct Thiokol's disposal of tetryl or its general program for safety. The government had no duty to do so because it did not own or have an interest in the tetryl in question. The government inspectors did not act on their own to supervise or give advice to Thiokol

regarding the destruction of tetryl. Therefore, Section 410 is not apposite here.

The plaintiff orally renewed his contention that the government, through its inspectors at the Thiokol plant, had such control over the production and disposal of tetryl that the government should be held vicariously liable for any negligent conduct of Thiokol. In my earlier opinion in this case, this theory of liability was rejected, 327 F.Supp. 1277, 1279 (E.D.Pa.1971). In addition I now hold as the fact finder that there was no control by the government over Thiokol's employees, production, safety procedures or disposal of explosives involving the tetryl which exploded. Even if plaintiff's theory is viable, the facts do not fit such theory.

The plaintiff has, at best, sustained the burden of proving that he was inexperienced in disposing of dangerous explosives, but nevertheless proceeded to do so in the face of orders from his direct superior not to proceed, and that as a result of his lack of experience in recognizing tetryl, the explosion occurred. Plaintiff has shown no liability on the part of the government. The evidence clearly demonstrated that the government had no duty and undertook no obligation to observe, oversee, direct or assist in the destruction of the tetryl.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter and the government is not immune from this suit.

2. The government did not breach any duty or warranty owed to the plaintiff arising from the sale of tetryl to Thiokol.

3. The government owed no duty to the plaintiff or to Thiokol to inspect or give advice concerning the disposal of tetryl on April 23, 1965.

4. The government inspector did not gratuitously undertake any duty to inspect or to give advice concerning the disposal of tetryl on April 23, 1965.

5. The government did not breach any duty to warn Mr. Toppi or Thiokol of the dangerous propensities of tetryl.

6. The government is not vicariously liable for any acts of Thiokol.

Neither counsel in this case elected to take depositions of parties or witnesses. As a result, the plaintiff had to use a "shot gun" approach in his pretrial memorandum and in arguing his legal theories before this Court. The trial was delayed because new witnesses and records were discovered during the trial. In addition, many minor but time consuming points of the case could have been settled by stipulation had pretrial discovery been undertaken.

To the extent the discussion contains findings of fact and/or conclusions of law, the same are adopted as part of the findings of fact and conclusions of law.

At the conclusion of the plaintiff's case, defendant moved for a directed verdict, which the Court deferred until the conclusion of the trial. At this time, I will deny that motion, but on the question of liability, after considering all the evidence, I find for the defendant.