Stella J. NEAL, Administratrix of the Estate of George R. Neal, and Stella J. Neal on her own behalf; Levina Romano, Administratrix of the Estate of Louis Romano, and Levina Romano on her own behalf; Harry F. Belz and Marian Belz; Walter and Helen Bogdanski; Judy Simpson, Administratrix of the Estate of Arnold Foulke; Helen Hojnacki, Administratrix of the Estate of Edward J. Hojnacki and Helen Hojnacki on her own behalf; Ronald A. Lenzi, Sr. and Lillian Lenzi; Joseph and Ann Mancini; Corrie Mitchell; Salvatore and Virginia Pascale; Vincent and Mary C. Raymond; Pasquale and Rita Ann Romano; Gerald C. and Margaret Wilmer; Jerry and Ruth B. Henley; Nathaniel and Lucille Satterwhite

v.

CAREY CANADIAN MINES, LTD., Johns-Manville Corporation, Johns-Manville Products Corporation, Johns-Manville Sales Corporation, Canadian Johns-Manville Co., Ltd., Canadian Johns-Manville Mining Co., Ltd., Canadian Johns-Manville Asbestos, Ltd., Bell Asbestos Mines, Ltd., Asbestos Corporation, Ltd., Celotex Corporation, North American Asbestos Corporation, Philip Carey Manufacturing Company, Inc.

Civ. A. No. 78–4242.

United States District Court, E. D. Pennsylvania.

Aug. 31, 1982.

Lawrence D. Levin, Norristown, Pa., and Martin Greitzer, Philadelphia, Pa., for plaintiffs.

Joel D. Gusky, Philadelphia, Pa., for Carey Canadian Mines, Ltd.

Robert St. Leger Goggin, and Charles W. Craven, Philadelphia, Pa., for Johns-Manville Group.

F. James Gallo, Philadelphia, Pa., for Bell Asbestos Mines, Ltd.

Frederic L. Goldfein, Philadelphia, Pa., for Asbestos Corp., Ltd.

Thomas O. Malcolm, West Chester, Pa., for Celotex Corp. and Philip Carey Mfg. Co., Inc.

Anthony S. Minisi, Philadelphia, Pa., for North American Asbestos Corp.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This is a diversity action brought by former workers of the Philip Carey Manufacturing Company, Inc. ("Philip Carey"), their spouses, and representatives of decedents' estates, for compensatory and punitive damages arising out of the claimants' exposure to asbestos fiber while they were employed at the Philip Carey manufacturing plant in Plymouth Meeting, Pennsylvania. Presently before the Court are the post-trial motions filed both by plaintiffs and defendants. For the reasons which follow, the motions are denied.

### I. *Facts*

On November 28, 1978, this action was commenced by the filing of plaintiffs' complaint in the Court of Common Pleas of Montgomery County, Pennsylvania. On December 19, 1978, defendants removed this case to federal court. Plaintiffs' complaint was brought on behalf of twenty-four former employees of the Philip Carey manufacturing plant, located in Plymouth

Meeting, Pennsylvania. At this plant, Philip Carey manufactured asbestos-insulation products which contained raw asbestos fiber. The Plymouth Meeting plant opened in 1907 and closed in 1962. Plaintiffs sued Celotex Corporation ("Celotex"), as the successor-in-interest to Philip Carey, because plaintiffs allegedly contracted asbestos-related diseases through the inhalation of asbestos fiber used in the manufacture of insulation material at that plant. Plaintiffs also sued the following five companies because they allegedly supplied asbestos fiber to the Plymouth Meeting manufacturing plant during the time periods in which plaintiffs worked at that plant—Asbestos Corporation Limited ("Asbestos Corp."); Bell Asbestos Mines, Limited ("Bell Asbestos"); Carey-Canadian Mines, Limited ("Carey-Canadian"); Johns-Manville Corporation, Johns-Manville Products Corporation, Johns-Manville Sales Corporation, Canadian Johns-Manville Company, Limited, Canadian Johns-Manville Mining Company, Limited, Canadian Johns-Manville Asbestos, Limited (collectively "Johns-Manville"); and North American Asbestos Corporation ("NAAC").[1]

Following the initiation of the action, two years of protracted discovery and lengthy pretrial proceedings with attendant delay ensued. Finally, on February 20, 1981, fifteen of the twenty-four claims were consolidated for trial and a jury was empaneled to hear the case.[2] The issues of liability and damages were bifurcated by the Court and the following claims were heard:

| Workers | | Dates of Employment |
|---|---|---|
| (1) | George Neal | 1926–1962 |
| (2) | Louis Romano (deceased) | 1929–1962 |
| (3) | Harry F. Belz | 1944–1961 |
| (4) | Walter Bogdanski | 1929–1962 |
| (5) | Arnold Foulke (deceased) | 1936–1962 |
| (6) | Edward J. Hojnacki (deceased) | 1950–1961 |
| (7) | Ronald A. Lenzi, Sr. | 1947–1962 |
| (8) | Joseph Mancini | 1936–1961 |

1. Additional suppliers of asbestos fiber were named in plaintiffs' complaint but were dismissed prior to the trial of this case.

2. Prior to February 20, 1981, each of the remaining nine worker claims had either been

settled or dismissed because of the expiration of the statute of limitations. *See e.g., VanBuskirk, et al. v. Carey-Canadian Mines, Ltd., et al.,* No. 80–2555 (3d Cir. June 2, 1982) (order dismissing appeal for failure to prosecute).

| Workers | Dates of Employment |
|---|---|
| (9) Corrie Mitchell | 1933–1962 |
| (10) Salvatore Pascale | 1946–1962 |
| (11) Vincent Raymond | 1948–1959 |
| (12) Pasquale Romano | 1950–1961 |
| (13) Gerald C. Wilmer | 1951–1960 |
| (14) Jerry Henley | 1945–1962 |
| (15) Nathaniel Satterwhite | 1946–1962 |

Defendants admitted that each of these workers had an asbestos-related condition by reason of exposure to asbestos fiber at the Plymouth Meeting plant but contested liability for each of the plaintiffs' injuries. Four principal issues were presented to the jury with respect to each plaintiff at the liability trial:

(1) whether the plaintiff, prior to November 28, 1976, knew or had reason to know that he had an asbestos-related condition caused by his exposure to asbestos fiber at Philip Carey's Plymouth Meeting manufacturing plant;

(2) whether the supplier defendants—Carey-Canadian, Asbestos Corp., Johns-Manville, NAAC and Bell Asbestos—were liable because they supplied asbestos fiber, without a warning of the dangers of asbestos exposure to the manufacturing plant, which proximately caused plaintiffs' injuries;

(3) whether Celotex was liable because Philip Carey intentionally failed to warn its former employees that they might have acquired an asbestos-related disease when Philip Carey officials had been advised by Dr. Thomas F. Mancuso, in October, 1963, that its former employees should be informed of this danger; and

(4) whether the conduct of Philip Carey, whether negligent or intentional in failing

to warn, was a superseding cause for any injuries sustained by plaintiffs after October 1, 1963.[3]

The liability trial, which was the first multi-plaintiff asbestos case tried in this district, lasted twenty-nine trial days, during which thirty-eight live witnesses testified, ten depositions were read, and over one hundred exhibits were presented to the jury. Following two and one-half days of deliberation, the jury returned its liability verdict which can be summarized as follows:

(1) all of the claims except that of George Neal were not barred by the Pennsylvania statute of limitations;

(2) all of the supplier defendants, except Bell Asbestos, were liable under § 402A products liability and negligence principles for the asbestos-related diseases suffered by each plaintiff;

(3) Celotex was liable for the aggravation of each plaintiff's injuries because of its intentional failure to warn;

(4) Celotex and Johns-Manville were additionally liable for punitive damages because of their outrageous conduct; and

(5) Celotex's conduct was not a superseding cause of each plaintiff's injuries suffered after October 1, 1963.

Following the liability verdicts, individual damage trials were held which lasted a sum total of twenty-five trial dates during which individual damage verdicts were rendered for each plaintiff. The actual compensatory and punitive damages awarded by the jury for each individual plaintiff in the order in which the cases were presented is summarized in the chart in footnote 4.[4]

---

**3.** The Court held at trial that plaintiffs could not recover against Celotex for their injuries sustained prior to 1963 because of the Pennsylvania Workmen's Compensation Act and Penn- sylvania Occupational Disease Act. *See* section V, A *infra.*

**4.**

| CLAIMANT | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | | LOSS OF CONSORTIUM OR WRONGFUL DEATH WIFE | TOTAL AWARD |
|---|---|---|---|---|---|
| | | JOHNS–MANVILLE | CELOTEX | | |
| Joseph Mancini | $ 71,000 | $10,000 | $ 3,000 | $ 5,000 | $ 89,000 |
| Arnold Foulke, decedent | $105,000 | $30,000 | $60,000 | Not Applicable | $195,000 |
| Louis Romano, decedent | $ 50,000 | $35,000 | $ 7,000 | $40,000 | $132,000 |

## II. *Motions for Judgment N. O. V. by All Defendants—Statute of Limitations*

■ The Pennsylvania statute of limitations, 42 Pa.C.S.A. § 5524 provides in pertinent part:

§ 5524. Two year limitation

The following actions and proceedings must be commenced within two years:

.　　.　　.　　.　　.

(2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

.　　.　　.　　.　　.

With respect to injuries or disease for which the causes are not readily apparent, the statute of limitations does not begin to run against the prospective plaintiff until such time that plaintiff either knew or had reason to know of the injury, the operative cause of the injury, and the causal relationship between the injury and the operative conduct. *Anthony v. Koppers, Co. Inc.,* 284 Pa.Super. 81, 425 A.2d 428, 436 (1980) (quoting *Volpe v. Johns-Manville Corp.,* 4 P.C.R. 290 (Phila.C.P.1980)). *See Bayless v. Philadelphia National League Club,* 579 F.2d 37, 39 (3d Cir. 1978).

■ This so-called "discovery rule" has been applied in asbestos cases. *Volpe v. Johns-Manville Corp.,* 4 P.C.R. 290 (Phila.C.P.1980) (Takiff, J.); *DeMato v. Turner & Newall, Ltd.,* 651 F.2d 908, 909 (3d Cir. 1981); *Grabowski v. Turner & Newall,* 516 F.Supp. 114, 118–119 (E.D.Pa.1980). A statute of limitations is an affirmative defense for which the defendant has the burden of proof. *See* Fed.R.Civ.P. 8(c). Before a Court can direct a verdict in favor of the moving party, it must find that the evidence was overwhelming and that there is insufficient evidence to permit any different finding in favor of the non-moving party. *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 (3d Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

### (A) *Edward Hojnacki*

■ Defendants assert that there is overwhelming evidence in the record that Edward Hojnacki knew of his asbestos-related condition, the operative cause, and the causal relationship prior to November 28, 1976. Defendants cite the testimony of Dr. Eugene Labowski, Mr. Hojnacki's former treating physician, as dispositive of this question. Although Dr. Labowski's testimony sufficiently establishes that Mr. Hojnacki knew that he suffered from a chronic lung condition prior to November 28, 1976, the Court finds that his testimony does not overwhelmingly establish that Mr. Hojnacki knew or had reason to know of the operative cause of his injury—that of exposure to asbestos fiber at the Philip Carey plant. *See* N.T. 21.151—N.T. 21.155. Helen Hojnacki testified that, to the best of her knowledge, her husband was not aware, prior to 1978, that he had an asbestos-related condition as a result of exposure to asbestos fiber. N.T. 26.62. For these reasons, the Court holds that the jury's find-

| CLAIMANT | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | | LOSS OF CONSORTIUM OR WRONGFUL DEATH WIFE | TOTAL AWARD |
|---|---|---|---|---|---|
| | | JOHNS–MANVILLE | CELOTEX | | |
| Edward Hojnacki, decedent | $300,000 | $90,000 | $15,000 | $72,000 | $477,000 |
| Pasquale Romano | $261,000 | $50,000 | $ 3,000 | $ 5,000 | $319,000 |
| Salvatore Pascale | $ 7,000 | –0– | –0– | –0– | $ 7,000 |
| Jerry Henley | $ 10,000 | $ 2,000 | $ 1,500 | –0– | $ 13,500 |
| Nathaniel Satterwhite | $139,500 | $60,000 | $ 500 | Not Applicable | $200,000 |
| Vincent Raymond | Settled | - - - | - - - | - - - | Settled |
| Walter Bogdanski | Settled | - - - | - - - | - - - | Settled |
| Corrie Mitchell | Settled | - - - | - - - | - - - | Settled |
| Gerald Wilmer | $ 85,000 | $10,000 | –0– | $ 5,000 | $100,000 |
| Ronald Lenzi | $ 80,000 | $20,000 | $ 5,000 | –0– | $105,000 |
| Harry Belz | $105,000 | $36,000 | –0– | $ 9,000 | $150,000 |

ings that Mr. Hojnacki did not know or have reason to know of the cause of his asbestos-related condition until after November 28, 1976, is supported by ample evidence present in the record and, therefore, defendants' motion for judgment n. o. v. will be denied.

### (B) *Nathaniel Satterwhite*

Defendants also assert that plaintiff Nathaniel Satterwhite knew or had reason to know that he had an asbestos-related disease caused by his exposure to asbestos fiber at the Plymouth Meeting plant, prior to November 28, 1976, on the basis of the testimony of William H. Rodgers, M.D., who was Mr. Satterwhite's treating physician. Dr. Rodgers testified that he informed Mr. Satterwhite in 1972 of his asbestos-related condition caused by his exposure to asbestos fiber at the Philip Carey plant. N.T. 22.87, N.T. 22.89. However, Mr. Satterwhite testified that he did not learn that he had asbestosis caused by his exposure to asbestos fiber until the early spring of 1978 when he began to have breathing problems at his new place of employment. N.T. 15.14–15.15. Moreover, Mr. Satterwhite specifically testified that he did not know back in 1972 or 1973 that his lung condition, revealed by earlier chest x-rays, was caused by exposure to asbestos fiber. N.T. 15.29–15.30. The issue of credibility was for the jury. For these reasons, the Court holds that there is sufficient evidence from which a jury could find that Mr. Satterwhite did not know or have reason to know of the operative cause of his asbestos-related condition and defendants' motion for judgment n. o. v., therefore, will be denied.[5]

### III. *Motions for Judgment N. O. V. by Supplier Defendants*

### (A) *Absence of Warning—Proximate Causation*

First, supplier defendants contend that they had no duty to warn as a matter of law. The jury found that, pursuant to § 402A product liability, the asbestos fiber supplied by supplier defendants was defective because it was not accompanied by an adequate warning and that it proximately caused each plaintiff's asbestos-related condition. Moreover, the jury found that each supplier defendant was negligent for failing to provide an adequate warning and that this conduct was a proximate cause of each plaintiff's asbestos-related injuries. Supplier defendants contend that there was no duty to warn employees, like plaintiffs, of the dangers associated with asbestos exposure because such dangers were already known by plaintiffs' employer, Philip Carey.

In strict products liability actions under § 402A of the Restatement (Second) of Torts, the Pennsylvania Supreme Court, in *Berkebile v. Brantley Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975), made it clear that a manufacturer of an inherently dangerous product has a non-delegable duty to provide warnings to the ultimate consumer or user. The court stated:

> Where warnings or instructions are required to make a product nondefective, it is the duty of the manufacturer to provide such warnings in a form that will reach the *ultimate consumer* and inform of the risks and inherent limits of the product. *The duty to provide a non-defective product is non-delegable.*

*Id.* at 103, 337 A.2d at 903 (emphasis added).

In a negligence case, section 388 of the Restatement (Second) of Torts, provides

---

**5.** Prior to trial, the Court granted defendants' motions for summary judgment with respect to the claims of Lola Lindsey, Mary Goodwin, and Florence Pegrine because of the operation of the Pennsylvania statute of limitations. However, the Court denied motions for summary judgment against the remaining plaintiffs because there were genuine issues of material fact as to when each plaintiff had knowledge or should have had knowledge, by use of reasona-

ble diligence, that the operative cause of each plaintiff's injury was his exposure to asbestos fiber at the Philip Carey manufacturing plant. *Order of September 23, 1980* (Docket No. 562); *Order of October 17, 1980* (Docket No. 631). *See VanBuskirk, et al. v. Carey-Canadian Mines, Ltd., et al.,* No. 80–2555 (3d Cir. June 2, 1982) (order dismissing appeal for failure to prosecute).

the applicable standard. That section provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, *if the supplier*
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition,* and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts, § 388 (1965) (emphasis added). Defendant suppliers are imposed with the duty to warn of asbestos exposure hazards under § 388 because plaintiffs were ultimate users of this asbestos fiber. *See Dougherty v. Hooker Chemical Corp.,* 540 F.2d 174 (3d Cir. 1976). Supplier defendants nevertheless cite the cases of *Toppi v. United States,* 332 F.Supp. 513 (E.D.Pa.1971) and *Lockett v. General Electric Co.,* 376 F.Supp. 1201 (E.D.Pa.1974), *aff'd,* 511 F.2d 1394 (3d Cir. 1975) in support of their contention that there was no duty to warn because of the employer's independent knowledge of the hazards associated with asbestos exposure. In *Toppi v. United States, supra,* the Court held after a non-jury trial that both the plaintiff and plaintiff's employer were well aware of the dangerous explosive potential of tetryl, the product which plaintiff claimed to be defective because of the absence of a warning. 332 F.Supp. at 517. In *Lockett v. General Electric Co., supra,* the court granted defendant's motion for a judgment n. o. v. because there was no duty by the defendant manufacturer of a gear to warn a subsequent assembler or the assembler's employee that an employee's arm may be caught by a gear because of the obviousness of the

danger of operating an unguarded gear. 376 F.Supp. at 1208–1213. Both *Toppi* and *Lockett* are distinguishable from the facts of the present case because the dangers associated with asbestos exposure are not readily apparent to the user in the absence of an adequate warning. *See, e.g., Dougherty v. Hooker Chemical Corp., supra.* In both *Toppi* and *Lockett* the dangers of the respective products were either readily obvious or made known. The record is replete with testimony that plaintiffs were never warned by Philip Carey during the tenure of their employment of the dangers associated with asbestos exposure and that they were not aware of the dangers until many years after the termination of their employment relationship. Due to the latent dangers associated with exposure to asbestos fiber and the foreseeable risk that an employer with knowledge of such dangers would not warn its own employees of this danger, *see* Restatement (Second) of Torts § 388, comment n, the Court will deny the motions for judgment n. o. v. because of the supplier defendants' non-delegable duty to warn users of asbestos fiber of the hazards associated with exposure to asbestos fiber.

*(B) Proximate Causation*

Secondly, supplier defendants argue that neither the absence of a warning on the bags of defendants' asbestos fiber or the alleged negligence of the suppliers in failing to provide a warning was a proximate cause of plaintiffs' injuries as a matter of law. It is admitted by defendants that the cause of plaintiffs' asbestos diseases was that of their exposure to asbestos fiber at the Philip Carey plant. Supplier defendants contend, however, that the absence of a warning or their failure to provide a warning was not a proximate cause or a substantial contributing factor in causing each plaintiff's asbestos-related condition. Rather, supplier defendants point to the conduct of Philip Carey, which was not within their immediate control, as the proximate cause of each plaintiff's injuries. In determining whether a judgment n. o. v. should be granted to a defendant,

the Court must consider the record as a whole in a light most favorable to the non-moving party, drawing all reasonable inferences to support its contentions, in order to determine whether there is sufficient evidence from which a reasonable jury could find in favor of the plaintiffs. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Testimony was presented by the individual plaintiffs that, had they known about the dangers associated with asbestos exposure, they would have discontinued their work at the Philip Carey manufacturing plant or taken other precautionary measures during the course of their employment. It is reasonably inferable from the evidence presented that the use of a warning would have precipitated cautionary measures both by Philip Carey and its own employees through dust control, personal protection, medical monitoring and further education of the workers of the hazards of asbestos exposure at that plant. The union at the Philip Carey plant had been active in seeking safety reforms. A safety committee had been purposefully formed, composed of both employees and management. For these reasons, the Court holds that there is sufficient evidence to support the jury's findings that the absence of a warning was a proximate cause of each plaintiff's asbestos-related condition. The decisions in *Greiner v. Volkswagenwerk, Aktiengesellschaft*, 429 F.Supp. 495 (E.D.Pa.1977) and *Day v. Vokswagenwerk Aktiengesellschaft*, 451 F.Supp. 4 (E.D.Pa.1977), are distinguishable from the present facts because reasonable inferences may be drawn from the testimony presented at trial that the communication of a warning to the employees as users of the asbestos fiber *would* have resulted in protective measures both by the employer and employees to prevent the contracting of asbestosis and other asbestos-related conditions by the workers.

◼ Third, supplier defendants argue that the conduct of the employer defendant, Philip Carey, was the sole proximate cause of plaintiffs' asbestos-related conditions as a matter of law. Supplier defendants specifically cite the acts or omissions of the employer, Philip Carey—the failure to reduce the quantum of asbestos dust in the manufacturing plant, the failure to advise its employees of the consequences of asbestos exposure, the failure to require the use of respirators in the general work environment, and the failure to maintain an active medical examination and health surveillance program for its employees—as the sole proximate cause of plaintiffs' asbestos-related conditions. Essentially, supplier defendants' argument is another variant of their argument that the absence of a warning or their failure to warn was not a proximate cause of plaintiffs' asbestos-related conditions. A defendant's conduct is a proximate cause of an injury whenever it is a substantial contributing factor in bringing about the harm. *Whitner v. VonHintz*, 437 Pa. 448, 263 A.2d 889, 893–894 (1970); Restatement (Second) of Torts, § 431 (1965). In this case, there is substantial evidence that supplier defendants' failure to place a warning on the asbestos bags was a proximate cause of plaintiffs' injuries. For the reasons stated earlier, judgment n. o. v. will not be awarded on this ground.

### (C) Superseding Cause

◼ Fourth, supplier defendants argue that the conduct of plaintiffs' employer, Philip Carey, was a superseding cause of plaintiffs' injuries as a matter of law. Section 447 of the Restatement (Second) of Torts has been adopted in Pennsylvania for defining "superseding cause" in order to determine when an original tortfeasor will be absolved from liability because of an intervening act. *Grainy v. Campbell*, 493 Pa. 88, 425 A.2d 379, 381–382 (1981); *Estate of Flickinger v. Ritsky*, 452 Pa. 69, 305 A.2d 40 (1973). Section 447 provides:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as *highly extraordinary* that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Restatement (Second) of Torts, § 447 (1965) (emphasis added). In addition, an original tortfeasor may be relieved from liability because of a third person's failure to act:

> ... where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person ....

Restatement (Second) of Torts, § 452(2). The factors to be considered in determining whether all duty and responsibility for the prevention of harm has passed to a third person are as follows:

> ... the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations.

Restatement (Second) of Torts, § 452(2), comment f. Supplier defendants contend that the conduct of Philip Carey in failing to provide adequate protection for its workers from hazardous asbestos exposure was a superseding cause as a matter of law because the duty had shifted to Philip Carey to provide such protection. Supplier defendants cite the substantial magnitude of the risk and degree of danger resulting from exposure to asbestos fiber and dust, the independent duty of Philip Carey to provide a safe workplace, the contention that Philip Carey knew of the dangers of asbestos fiber and dust, and the lapse of a significant period of time from the late 1920's to the plant's closing in 1962, during which time efforts could have been made to provide adequate protection. Supplier defendants cite *Schreffler v. Birdsboro Corp.,* 490 F.2d 1148 (3d Cir. 1974) (holding that employer's unilateral modification of a transfer table to allow an employee to stand on top of the table when processing hot steel billets, interval of six years between the date of sale and the accident, and employer's failure to implement safety recommendations amounted to superseding cause of plaintiff's injuries as a matter of law) and *Meuller v. Jeffrey Mfg. Co.,* 494 F.Supp. 275 (E.D.Pa.1980), *affirmed,* 649 F.2d 860 (3d Cir. 1981) (holding that employer's failure to guard opening in floor by steel cage ordinarily used for that purpose and lapse of fifteen years from the sale of sand handling equipment to employer and date of plaintiff's injuries amounted to superseding cause of employee's injuries as a matter of law). Second, supplier defendants contend that Philip Carey's failure to provide adequate protection and warning was highly extraordinary and unforeseeable to supplier defendants. The Court holds that *Schreffler v. Birdsboro Corp., supra,* and *Meuller v. Jeffrey Mfg. Co., supra,* are distinguishable from the facts of the present case. The dangers in *Schreffler* and *Meuller* were patent and obvious to both the employer and employees. In the present case, the dangers of asbestos exposure are not immediately obvious and, therefore, latent as opposed to patent defects. The fact that Philip Carey was in a better position to protect the plaintiffs from exposure to asbestos fiber and dust does not automatically mean that Philip Carey's conduct was a superseding cause of plaintiffs' injuries. Supplier defendants did not present any evidence that the conduct of the employer, Philip Carey, was highly extraordinary within the industry and, thus, unforeseeable to the supplier defendants. *See* N.T. 21.74–21.77; 21.224–21.225; 21.-228–21.233. Rather, supplier defendants presented evidence of inadequate dust control, the absence of warnings, and the absence of adequate medical monitoring which, although relevant to the issue of

proximate cause, did not amount to sufficient evidence of extraordinariness within that industry as evidenced by the conditions in the supplier defendants' *own* plants. N.T. 22.4–22.35. For these reasons, the Court did not find that there was sufficient evidence to charge the jury that the conduct of Philip Carey prior to the plant's closing may be found to have been extraordinary and that it might constitute a superseding cause of plaintiffs' injuries. However, the Court did charge that the conduct of Philip Carey after the plant's closing around 1962 in failing to warn its employees following the recommendations of Dr. Thomas F. Mancuso that its former and present employees be warned of the danger that they might have contracted an asbestos-related condition could constitute a superseding cause if found to be extraordinary and unforeseeable by the jury. Nevertheless, the jury found that Philip Carey's intentional failure to warn was not a superseding cause of each plaintiff's asbestos-related condition. For these reasons, supplier defendants are not entitled to judgment n. o. v. on the basis of the contention that the conduct of Philip Carey, both prior to and after 1963, was a superseding cause of each plaintiff's injuries.

### (D) *Asbestos Fiber—Product*

Asbestos fiber is an indestructible material known for its heat resistance. Supplier defendants contend that raw asbestos fiber is not a product because it is a mineral mined from the ground. Section 402A of the Restatement provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts, § 402A (1965). Strict liability extends "to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate consumer or user." Restatement (Second) of Torts, § 402A, comment d. Moreover:

Normally the rule stated in this Section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated.

Restatement (Second) of Torts, § 402A, comment e. Thus, it is clear that asbestos fiber which is extracted through the crushing of the asbestos rock and then compacted into bags is a product within the definition of § 402A. It is no different than a poisonous mushroom extracted from the ground, which, no matter what changes it undergoes, is still poisonous to the user or consumer.

Moreover, sufficient evidence was produced at trial that asbestos fiber is an "unavoidably unsafe product" because of its indestructible propensity which can only be made safe through the provision of an adequate warning. *See* Restatement (Second) of Torts, § 402A, comment k. Thus, because asbestos fiber, although a mineral, is marketed for potential use by the consumer, it falls within the definition of "product" for purposes of both the § 402A products liability and § 388 negligence claims. For these reasons, supplier defendants' motion for judgment n. o. v. on the ground

that raw asbestos fiber is not a product will be denied.[6]

## IV. *Motions for Judgment N.O.V. by Individual Suppliers*

### (A) *North American Asbestos Corporation*

NAAC contends that plaintiffs have failed to show that NAAC was a supplier of asbestos fiber to the Plymouth Meeting plant. NAAC argues that it was a mere "facilitator" for the delivery of asbestos fiber from Cape Asbestos Corporation in South Africa to the Plymouth Meeting plant. NAAC argues that it served as a mere message center for shipping arrangements and that it never exercised any control or title to the asbestos fiber delivered to the Plymouth Meeting plant. Under Pennsylvania law, liability under § 402A may be imposed upon the manufacturer, *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 29, 319 A.2d 903 (1974), and others who take title to or have physical control over the product. *See, e.g., Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966) (beer distributors); *Francioni v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736 (1977) (equipment lessors). Similarly, liability for negligence under § 388 of the Restatement (Second) of Torts can only attach if the person was a supplier of the product—defined as one who "gives possession" or one who has "control." Restatement (Second) of Torts, § 388, comment c. The Court holds that there is sufficient evidence from which the jury could find that NAAC was a supplier of asbestos fiber to the Plymouth Meeting plant. First, various witnesses testified that crocidolite asbestos fiber from South Africa was used at the Plymouth Meeting plant, the type of fiber NAAC sold. Second, plaintiffs presented the testimony of Joseph P. Lobb, who was an employee at the Plymouth Meeting plant from June, 1946 to December, 1957. Mr. Lobb testified that he held the position of receiving clerk from 1949 to 1952, during which he prepared receiving reports for as-

bestos fiber at the Plymouth Meeting plant. N.T. 10.40. He testified that from 1952 to 1955, he was an assistant purchasing agent and monitored the requisition orders of NAAC fiber. N.T. 10.43. Finally, from 1955 to 1957, Mr. Lobb was a supervisor of accounts payable with the duty of matching the invoices for asbestos fiber against the receiving reports which were then to be forwarded to Philip Carey headquarters at the Lockland, Ohio plant. N.T. 10.47. Mr. Lobb identified NAAC as a supplier of raw asbestos fiber to the Plymouth Meeting plant by virtue of its requirement contracts. N.T. 10.50. Third, Max Meyer, a former director of NAAC, testified that NAAC was incorporated as a wholly owned subsidiary of Cape Asbestos Company, Limited, in 1953, with the stated purpose "to manufacture, buy, sell, deal in and with asbestos and asbestos products." N.T. 24.95–24.96. The parent corporation, Cape Asbestos Company, Limited, also owned the South African Egnep Mines and Cape Blue Mines in which the crocidolite fiber was mined. N.T. 24.87. Finally, plaintiffs' exhibit 191 showed that NAAC received both sales income and commission income during 1954 to 1960 for the distribution of asbestos fiber to North America. This evidence expressly showed that NAAC engaged in the *sale* of asbestos fiber. For these reasons, the Court holds that there is sufficient evidence, both direct and circumstantial, from which the jury could reasonably find that NAAC was not a "facilitator" but a seller of asbestos fiber to the Plymouth Meeting plant.

### (B) *Carey-Canadian Mines, Limited*

Carey-Canadian contends that plaintiffs failed to produce sufficient evidence from which the jury could reasonably conclude that Carey-Canadian *qua* Carey-Canadian supplied raw asbestos fiber to the Plymouth Meeting plant. In addition to operating several manufacturing facilities across the country including the Plymouth Meeting plant, Philip Carey, in 1918, opened an as-

---

**6.** *See Hammond v. North American Asbestos Corp.,* 105 Ill.App.3d 103, 61 Ill.Dec. 843, 435 N.E.2d 540 (1982) (asbestos fiber is product).

bestos mine in East Broughton Station, Canada, known as Quebec Asbestos Corporation, Ltd. ("QAC"). QAC was a wholly-owned subsidiary of Philip Carey which mined raw chrysotile asbestos fiber until 1955. QAC was officially dissolved in 1961.

In 1955, Carey-Canadian was also incorporated as a wholly-owned subsidiary of Philip Carey. In September, 1958, Carey-Canadian started to mine raw chrysotile asbestos fiber from a new mine located four miles up the road from the old QAC mine. N.T. 23.138–23.139. Abner H. Bagenstose, a former industrial sales manager for Philip Carey, testified that the chief operating officers and management personnel from the old QAC mine went right to work at the new Carey-Canadian mine. N.T. 24.22–24.-23. Moreover, the old workers of the QAC mine were transplanted to the new Carey-Canadian mine. N.T. 24.23. Carey-Canadian continued to sell to the same customers, used some of QAC's old equipment, and used a similar logo to that of the QAC on their asbestos bags. N.T. 24.25. Carey-Canadian advertised in *Asbestos Magazine* that Carey-Canadian had started in the asbestos business back in 1918 with the mining of chrysotile asbestos in Quebec, Canada. N.T. 8.232–8.233. Finally, in answers to interrogatories, Carey-Canadian admitted that "Defendant [Carey-Canadian] is a successor to the Quebec Asbestos Corporation, Ltd., which was incorporated in 1924 in Quebec, Canada." N.T. 12.15–12.16.

■ The Court charged the jury that Carey-Canadian could only be held liable to the extent that it furnished fiber after it came into existence in 1955. N.T. 29.31. The Court added, however, that Carey-Canadian could also be held liable for asbestos fiber furnished by QAC if the jury found that Carey-Canadian was essentially a continuation of the business of QAC. N.T. 29.31–29.32. *See Knapp v. North American Rockwell Corp.,* 506 F.2d 361, 363 (3d Cir. 1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975) (liability for successor corporations). The jury returned a verdict in which the jury found that each plaintiff had been exposed to asbestos fiber

supplied by Carey-Canadian to the Plymouth Meeting plant. Carey-Canadian contends that it cannot be held liable because it presented substantial evidence that Carey-Canadian *qua* Carey-Canadian did not supply asbestos fiber to the Plymouth Meeting plant from September, 1958, the date that it began to mine asbestos fiber, to 1962, the date of the closing of the Plymouth Meeting plant. N.T. 23.175. Nevertheless, testimony was presented by Joseph Lobb (N.T. 10.50), Frank Dixon (N.T. 6.159, 6.162), Howard McClure (N.T. 8.69) and Odell Smith (N.T. 7.125), to substantiate the existence of "Carey" fiber from 1943 to 1958 at the Plymouth Meeting plant. Thus, the issue, more properly stated is whether there is sufficient evidence from which a jury could find that Carey-Canadian supplied asbestos fiber to the Plymouth Meeting plant either as Carey-Canadian *qua* Carey-Canadian or Carey-Canadian *qua* predecessor QAC. Abner Bagenstose testified that seventy-five percent of the asbestos fiber produced from the QAC mine was consumed by the individual Philip Carey manufacturing plants. N.T. 23.119–23.120. The Court holds that there is sufficient evidence from which the jury could find that Carey-Canadian was a successor to the QAC and that "Carey" fiber was supplied to the Plymouth Meeting plant. For these reasons, Carey-Canadian's motion for judgment n. o. v. will be denied.

(C) *Johns-Manville Corporations*

■ First, Johns-Manville contends that plaintiffs' evidence is insufficient to impose punitive damages on any of the Johns-Manville defendants. In order to grant a judgment n. o. v., the Court must find as a matter of law that plaintiffs failed to advance sufficient facts to justify the verdict. *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). The rule of punitive damages set forth in the Restatement (Second) of Torts § 908 has been adopted in Pennsylvania. *Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355 (1963). That section provides as follows:

§ 908. Punitive Damages

(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to *punish him* for his *outrageous conduct* and to *deter him* and others like him from similar conduct in the future.

(2) Punitive damages may be awarded for *conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.* In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Restatement (Second) of Torts, § 908 (1965) (emphasis added). In the present case, the Court dismissed the plaintiffs' punitive damage claims against all of the supplier defendants except the Johns-Manville defendants because "presence alone or knowledge alone or involvement on an association basis without more or even possession of the knowledge without some further evidence as to wantonness is insufficient to support the question of punitive damages being considered by the jury." N.T. 23.57. Nevertheless, the Court holds that there was sufficient evidence presented to the jury from which a reasonable jury could find that the conduct of Johns-Manville amounted to outrageous conduct which would support a punitive damages award on behalf of each plaintiff. Testimony indicating that Johns-Manville continually failed to warn users of hazards associated with the inhalation of asbestos fibers, despite overwhelming knowledge of those hazards by high ranking corporate officials, was presented through the deposition testimony of Hugh M. Jackson and Dr. Kenneth Wallace Smith. Hugh Jackson was the director of safety for Johns-Manville from 1947 to 1952 and manager of the industrial health program from 1952 to 1960. Mr. Jackson was directly responsible for the management of the Johns-Manville industrial health program. N.T. 5.156. Mr. Jackson first became aware of the dangers of asbestos exposure in 1947. N.T. 5.205–5.206. He became a member of the American Industrial Hygienists Association ("AIHA") and attended several symposia at the Saranac Lake Laboratories in New York on the subject of asbestos disease during the 1950's. N.T. 5.208. In addition, Mr. Jackson was a member of the Air Hygiene Committee of the Asbestos Textile Institute ("ATI") from 1948 to 1955, and chairman of that committee from 1953 to 1955. In his capacity as chairman, Mr. Jackson became acutely aware of the dangers of asbestos exposure and the inhalation of asbestos fiber and dust. N.T. 5.224–5.237; N.T. 6.7–6.15. Mr. Jackson discussed the subject of a warning on the bags containing asbestos fiber with Dr. Kenneth Smith during the 1950's; however, Johns-Manville never affixed such a warning *until 1969.* N.T. 6.46–6.51; *see* N.T. 35.57.

Dr. Kenneth Smith joined Canadian Johns-Manville, a division of Johns-Manville, as a medical officer in 1943 or 1944 and assumed the position of medical director for Canadian Johns-Manville from 1947 to 1951. In 1952, Dr. Smith became the chief medical director for the entire Johns-Manville corporation and served in that capacity until 1966. Dr. Smith specialized in industrial medicine and occupational diseases. N.T. 7.40–7.41. Dr. Smith also authored several papers on asbestosis and the effects of the inhalation of asbestos dust during the late 1940's through the middle 1960's. N.T. 7.43–7.46. Dr. Smith, as well as other corporate officers of Johns-Manville, were familiar with early pulmonary disease studies conducted at the Saranac Lake Laboratories in New York during the late 1930's and in Great Britain with respect to inhalation of asbestos dust. N.T. 7.49–7.51. However, Dr. Smith did not become aware of the problems associated with the inhalation of asbestos dust until he first began to work for Canadian Johns-Manville in the mid-1940's. N.T. 7.56–7.57. In the late 1940's, Dr. Smith conducted a study with respect to the effects of inhalation of asbestos dust by Johns-Manville employees and then issued a report recommending various steps to decrease the level of exposure

to asbestos dust. N.T. 7.90–7.95. In late 1952 or early 1953, Dr. Smith recommended to the highest ranking corporate officials of Johns-Manville that warnings should be placed on asbestos fiber bags; however, the decision was made for whatever reason not to apply such a cautionary label. N.T. 7.114. While Dr. Smith continued to recommend the use of a warning label on asbestos fiber bags, it was not until 1969, over ten years later, that warning labels were finally adopted by Johns-Manville.

The aforementioned testimony sufficiently establishes that high ranking corporate officials were fully aware of the dangers of asbestos exposure during the mid-1940's and through the early 1960's and that they continually refused to act despite their ready knowledge of these dangers. Such testimony sufficiently supports an award of punitive damages against Johns-Manville since a reasonable jury could find by virtue of this evidence that Johns-Manville engaged in outrageous conduct by exhibiting a reckless indifference to the health and wellbeing of plaintiffs. Johns-Manville argues that Johns-Manville took affirmative steps to prevent and control the dangers of exposure to asbestos dust by pursuing their own studies, participating in the development and dissemination of knowledge through trade associations and independent institutions, and acting in positive pursuit of employee safety through physical plant improvements, personal protective gear and training. These arguments speak, however, to the weight of the evidence and not the sufficiency of the evidence from which a jury could reasonably conclude that Johns-Manville officials participated in outrageous conduct. For these reasons, Johns-Manville's motion for judgment n. o. v. on the asserted ground of insufficient evidence will be denied.

Secondly, Johns-Manville contends that punitive damages cannot be assessed in mass tort litigation because multiple punitive damage awards will annihilate or bankrupt a corporation. This argument has its genesis from dicta in *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967) (diversity action applying New York law).

In *Roginsky,* the Second Circuit reversed an award of punitive damages against a defendant drug manufacturer who had been sued in hundreds of cases nationwide due to its distribution of a drug named MER/29 which caused cataracts in unsuspecting patients. The court affirmed the jury's verdict insofar that it awarded compensatory damages to the plaintiff but reversed the award of punitive damages because of insufficient evidence of "complicity." In dictum, Judge Friendly expressed the fear that recovery of punitive damages in multiple tort actions might serve to bankrupt the tortfeasor corporation and end the business life of a company because of a single management sin. 378 F.2d at 838–841. Judge Friendly hypothesized that multiple awards of compensatory damages would serve a sufficient punitive element even though product liability insurance would blunt somewhat the deterrent effect. *Id.* at 841. Nevertheless, Judge Friendly noted that no court has held that the first punitive award would exhaust all claims for punitive damages and stated that it would be neither fair nor practicable to limit punitive recoveries to an indeterminate number of first-comers and, thus, deny punitive damages to future plaintiffs. *Id.* at 839.

Courts and commentators have noted that punitive damages serve as a critical deterrent in the area of consumer safety by encouraging manufacturers to take affirmative steps in product safety. Punitive damages serve to deter manufacturers from accepting the risk of paying compensatory damages rather than changing the business practice which would result in extra costs. *See, e.g., Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 451–457 (1980); *Sturm, Ruger & Co., Inc. v. Day,* Alaska, 594 P.2d 38, 47 (1979); *Owen, Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257, 1277–1299 (1976). *See also State ex. rel. Young v. Crookham,* 290 Or. 61, 618 P.2d 1268, 1271 (1980) (apprehension of corporate annihilation by punitive damages is exaggerated). Moreover, there is no legal or equitable basis to allow punitive damage awards to

the first plaintiffs in multiple product liability litigation but then to deny such a right to recovery to future plaintiffs. Each tort committed by the defendant is individual and peculiar to that particular plaintiff who has brought suit. Punitive damages are a recoverable item of relief so long as the conduct exhibited by the defendant with respect to that individual plaintiff can be termed as "outrageous" and a reckless indifference to the rights of that plaintiff. Restatement (Second) of Torts, § 908(2). Finally, Pennsylvania law requires that punitive damages be reasonably related to the amount of actual damages suffered by the plaintiff. *Givens v. W. J. Gilmore Drug Co.,* 337 Pa. 278, 10 A.2d 12, 16 (1940). Thus, corporate defendants are protected from excessive punitive damage awards through judicial control both at the district court and appellate levels. In this case, the punitive damage awards returned by the jury were not excessive and bear a reasonable relationship to the amount of actual damages suffered by each plaintiff. The punitive damages awarded in this case were the first punitive damages ever awarded against Johns-Manville in asbestos litigation. For these reasons, Johns-Manville's motion for judgment n. o. v. will be denied.

 Third, Johns-Manville contends that punitive damage awards are violative of the constitutional guarantees of due process. Johns-Manville argues that punitive damage standards are so vague so as to not afford adequate notice of the prohibited conduct. Moreover, Johns-Manville contends that the standards for punitive damages are so vague so as to leave judges and jurors free to decide without any legally fixed standards what the prohibited conduct is within the particular circumstances of the case. The essence of due process is fundamental fairness. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Pennsylvania law provides: "Punitive damages will be allowed for torts committed willfully, maliciously, or so carelessly as to indicate wanton disregard for the rights of the party injured." *Thompson v. Swank,* 317 Pa. 158, 159, 176 A. 211 (1934). The purpose behind awards of punitive

damages is to punish defendants for outrageous conduct and to deter similar future conduct. *Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355 (1963). Without determining whether constitutional standards may present a bar to the assessment of punitive damages in a civil case, *see Curtis Publishing Co. v. Butts,* 388 U.S. 130, 159, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094 (1967) (plurality opinion of Harlan, J.), the Court finds that the standard for outrageous conduct—"willfully, maliciously or so carelessly as to indicate wanton disregard of the rights of the party injured"—provides sufficient notice to a defendant of the consequences that such a wrongful act may have in a suit brought by plaintiffs for damages. *See* N.T. 29.72–29.75 (Court's charge on punitive damages). Defendants are justifiably expected to be aware that, by placing a product in the stream of commerce, they are potentially liable for compensatory damages caused by that product to a potential user or consumer. Similarly, defendants can be expected to be aware that, if their conduct is outrageous because it is willful, malicious or a wanton disregard of the rights of the party injured, then punitive damages may be awarded on the basis of the deficiencies of their product in light of their "outrageous" conduct. *Accord, Sturm, Ruger & Co., Inc. v. Day,* Alaska, 594 P.2d 38, 46 (1979); *Egan v. Mutual of Omaha Ins. Co.,* 63 Cal.App.3d 659, 133 Cal. Rptr. 899, 914–915 (1976). Finally, the standard for punitive damages is no more vague than the standards for preponderance of the evidence or proximate cause, or any number of court-defined standards that are applied frequently by judges and juries in civil or criminal cases.

 Fourth, Johns-Manville contends that the double jeopardy provision prohibits successive awards of punitive damages as punishment for "the same act." Johns-Manville has not cited any case law in support of the proposition that the fifth amendment double jeopardy provision protects a defendant who injures a plaintiff through its product. Nevertheless, the Court holds that, as a matter of law, since a

product seller owes a separate duty to each individual who is a consumer or user of such a product to refrain from "outrageous conduct" and, if the defendant exhibits "outrageous conduct" towards a particular individual through deficiencies in that product which causes injury to that plaintiff, then its course of conduct cannot be characterized as "the same act" because it is separate and distinct with respect to each individual plaintiff. The conduct of the tortfeasor must be viewed with respect to each individual plaintiff. Thus, the concept of double jeopardy does not serve to prohibit lawsuits and punitive damage claims by successive plaintiffs.

■ Finally, Johns-Manville contends that punitive damages cannot be assessed in a products liability action because the basis for liability is the *defectiveness of the product* which is incompatible and inconsistent with the basis for punitive damages which is the *defendant's conduct.* The Court finds that there is no theoretical problem in a jury finding that a defendant is liable because of the defectiveness of a product and then judging the conduct of the defendant in order to determine whether punitive damages should be awarded on the basis of "outrageous conduct" in light of the injuries sustained by the plaintiff. *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132, 144–147 (3d Cir. 1973); *Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. 255, 263–267 (E.D.Pa.1976). Punitive damage awards provide a useful function in punishing the wrongdoer and deterring product suppliers from making economic decisions to not remedy the defects of the product. *Sturm, Ruger & Co., Inc. v. Day,* Alaska, 594 P.2d 38, 47 (1979). By dispensing with the need to prove fault for purposes of establishing liability under section 402A, the law of strict liability does not preclude consideration of "aggravated fault," if the plaintiffs can properly meet their burden of demonstrating sufficient evidence of the defendant's outrageous conduct. In the present

case, as previously mentioned, plaintiffs produced sufficient evidence to show that the asbestos fiber was defective in the absence of an adequate warning and that Johns-Manville's conduct in failing to affix such a warning amounted to a reckless indifference of the health and safety of plaintiffs in light of the knowledge held by its corporate officials. For these reasons, Johns-Manville's motion for judgment n. o. v. will be denied.[7]

## V. *Motion for Judgment N.O.V. by Celotex Corporation*

### (A) *Intentional Tort*

■ Celotex argues that there is insufficient evidence from which a jury could reasonably find that its predecessor-in-interest, Philip Carey, had committed an intentional tort. In Pennsylvania, the liability of an employer to an employee for work-related injuries is limited solely to the provisions and remedies provided by the Pennsylvania Workmen's Compensation Act, Pa.Stat.Ann. tit. 77, §§ 1–1066; and Pennsylvania Occupational Disease Act, Pa.Stat.Ann. tit. 77, §§ 1201–1603. *See generally Hyzy v. Pittsburgh Coal Co.,* 384 Pa. 316, 121 A.2d 85 (1956), *Hartwell v. Allied Chemical Corp.,* 457 F.2d 1335 (3d Cir. 1972). However, an employee may recover against an employer for an intentional tort if the employer deliberately acts to injure his employee. In *Readinger v. Gottschall,* 201 Pa.Super. 134, 191 A.2d 694 (1963), the Pennsylvania Superior Court held that an employee can recover for injuries sustained by reason of a physical assault by the employer upon the employee. The court reasoned that the Workmen's Compensation Act "provide[s] for recovery of an injury arising out of an accident in the course of the employment. Nothing is said in any of them about *deliberate acts* or assaults by the employer." *Id.* at 137, 191 A.2d at 696 (emphasis added). However, in *Evans v. Allentown Portland Cement Co.,* 433 Pa. 595, 252 A.2d 646

---

7. The Court notes that Judge Takiff has similarly rejected the arguments presented by Johns-Manville with respect to the applicability of punitive damage awards in an asbestos suit

brought in the Common Pleas Court. *Noecker v. Johns-Manville Corporation, et al.,* No. 366 (118) April Term, 1977 (Ct. Common Pleas, Philadelphia County, April 28, 1982).

(1969), the Pennsylvania Supreme Court affirmed a lower court's dismissal of plaintiff's complaint because of its holding that an employer's wilful and unlawful violation of applicable safety regulations in removing safety guards from an electrically powered conveyor system did not constitute an intentional tort actionable outside the Pennsylvania Workmen's Compensation Act. In *Portland Cement,* an employee was killed after coming in contact with the conveyor system absent the guard. The Pennsylvania Supreme Court held that a deliberate intent to injure the plaintiff was needed to state a cause of action outside of the Pennsylvania Workmen's Compensation Act. Finally, in *Ulicny v. National Dust Collector Corp.,* 391 F.Supp. 1265 (E.D.Pa.1975), the district court held, in applying Pennsylvania law, that allegations of "reckless," "wanton," and "willful" acts or omissions by the employer in disregard of the safety of its employees, where an employee was crushed to death by a steel cover on a dust collecting system which closed on him, did not state a cause of action outside of the Pennsylvania Workmen's Compensation Act. The court stated the following rule as controlling:

> Since the legal justification for the common-law action is the nonaccidental character of the injury from the defendant employer's standpoint, the common-law liability of the employer cannot be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute or other misconduct of the employer short of genuine intentional injury.

391 F.Supp. at 1268 (quoting 2 Larson, The Law of Workmen's Compensation, § 68.13 (1975)). *See also Keating v. Shell Chemical Co.,* 610 F.2d 328, 332 (5th Cir. 1980); *Austin v. Johns-Manville Sales Corp.,* 508 F.Supp. 313, 316 (D. Maine 1981).

In the present case, Dr. Thomas F. Mancuso testified that he was specifically hired by Philip Carey in October, 1962 to study the problems of asbestos exposure at the Philip Carey facilities and to propose an occupational health program in order to decrease the number of worker asbestos exposure claims. N.T. 18.100–18.102. Dr. Mancuso had been the director of the Division of Industrial Hygiene for the State of Ohio from 1945 to 1962. As part of his work, Dr. Mancuso studied the death certificates of workers from Philip Carey's Plymouth Meeting plant from the time period of 1953 to 1962 and determined that there was a high degree of asbestos-related diseases and an occupational cancer problem in workers formerly employed at the Plymouth Meeting plant. N.T. 18.112–18.114. Dr. Mancuso discussed these problems with the president of Philip Carey, John Humphrey, and Carl Krieg, the employee relations manager, at a conference in July, 1963. N.T. 18.116–18.117. At that time, Dr. Mancuso specifically advised these high ranking corporate officials that there was an occupational cancer risk, that the former Philip Carey workers, which would have included the plaintiffs here, should be informed that they had a risk involving occupational cancer, and that they should be placed under medical surveillance for early detection of asbestos related conditions. N.T. 18.117. During the course of this meeting, Humphrey and Krieg disclosed that they were knowledgeable of the worker compensation claims that had been filed for asbestosis and lung cancer. N.T. 18.118. On September 23, 1963, Dr. Mancuso submitted his report to Philip Carey which recommended that the workers be warned that they were at risk because of the dangers of exposure to asbestos, that necessary protective measures be taken, and that these workers be placed under medical surveillance for early detection of asbestos-related conditions. N.T. 18.122–18.126. Moreover, Dr. Mancuso recommended a special study of the Plymouth Meeting workers because of important circumstantial evidence of the mortality pattern connected with the workers' exposure to asbestos at that plant. N.T. 18.123–18.124. After submitting his report, Dr. Mancuso's employment with Philip Carey was terminated. Celotex argues that there is insufficient evidence from which a reasonable jury could find that Philip Carey's

failure to notify its former employees in October, 1963, that they might have acquired an asbestos-related disease by reason of their exposure to asbestos during their employment at the Plymouth Meeting plant, constituted an intentional tort outside of the exclusivity provision of the Pennsylvania Workmen's Compensation Act. The Court charged the jury that the jury would have to find by a preponderance of the evidence "that Philip Carey intended to do an act or intended to fail to do an act that Philip Carey knew or believed would be substantially certain to cause harm to the plaintiff" in order to find liability on the intentional tort claim against Celotex. N.T. 29.83–29.84. The Court defined the harm as "the aggravation of a pre-existing work-connected asbestos-related disease." N.T. 29.84. Defendants had previously conceded that each plaintiff had an asbestos-related condition arising out of the exposure to asbestos fiber at Philip Carey's Plymouth Meeting plant. The Court emphasized that "Philip Carey, therefore, must be found to have known that the aggravation of a pre-existing asbestos-related disease was substantially certain to follow a failure to warn the employee before Philip Carey can be found to have acted intentionally." N.T. 29.84. In the present case, the Court holds that there is sufficient evidence from which a jury could find that the acts or omissions of Philip Carey officials in the face of the recommendations and urgings of Dr. Mancuso, constituted the deliberate intention to harm the plaintiffs by failing to notify them of the risks of their exposure to asbestos fiber following the shutdown of the Plymouth Meeting plant. See N.T. 21.-18–21.19. First, Dr. Mancuso's testimony demonstrates that high ranking officials of Philip Carey were fully aware of the dangers of asbestos exposure. N.T. 18.116–18.-117. John Humphrey, the president of Philip Carey, testified at a former deposition that he knew about the health hazards of asbestos exposure back in the early 1950's. N.T. 20.171. Second, Dr. Mancuso had been hired specifically because of the problems associated with asbestos exposure and Philip Carey's concern over the increasing number of workmen's compensation claims filed by its employees as a result of this exposure. N.T. 18.100–18.102; 24.181–24.183. Third, Dr. Mancuso pointed out the specific problems at the Plymouth Meeting plant through his mortality study for the years 1953 to 1962 and strongly recommended that all the Philip Carey workers be warned of the risks of the asbestos exposure and that they be placed under immediate medical surveillance for early detection of asbestos-related conditions. N.T. 18.122–18.126. For these reasons, the evidence was sufficient for the jury to conclude that Philip Carey, through the knowledge and inaction of its highest officials, despite professional and scientific consultation and advice, deliberately intended to injure the plaintiffs by choosing to totally and blatantly disregard Dr. Mancuso's warnings and recommendations that plaintiffs be informed of the risks that they had an asbestos-related condition.

Finally, this case is strikingly similar to that of *Sumski v. Sauquoit Silk Company, Inc.*, 66 Lackawana Jurist 118 (1965), in which an employer was held liable for an intentional tort outside of the Pennsylvania Workmen's Compensation Act. In *Sumski,* the employer knew that one of the employees had become severally ill due to the repeated inhalation of a dry cleaning solvent, carbon tetrachloride. Nevertheless, the employer fraudulently substituted the former solvent in unmarked bottles unbenownst to the employee because the new solvent, chlorothene, had not been as satisfactory a cleaning agent as the tetrachloride. The court held that the plaintiff employee could recover for her injuries against the employer because the employer, in substituting the tetrachloride in the unmarked bottles for that of chlorothene, had deliberately acted to harm the plaintiff. Similarly, in the present case, the highest officials of Philip Carey, in the face of the repeated urgings and recommendations of Dr. Mancuso that its employees be warned of the dangers of asbestos exposure, deliberately acted to aggravate each plaintiff's asbestos-related condition by their failure to follow Dr. Mancuso's advice. *See also*

*Johns-Manville Products Corp. v. Contra Costa Super. Ct.,* 27 Cal.3d 465, 612 P.2d 948, 165 Cal.Rptr. 858 (1980) (cause of action stated for aggravation of asbestos-related condition because of employer's fraudulent concealment of employee's condition and its cause from asbestos); *Blankenship v. Cincinnati Milacron Chemicals,* 69 Ohio St.2d 608, 433 N.E.2d 572 (1982). For these reasons, Celotex's motion for judgment n. o. v. will be denied.

### (B) *Proximate Cause*

■ Celotex argues that plaintiffs have failed to produce sufficient evidence to show that Philip Carey's failure to warn was a proximate cause of the asbestos-related conditions of claimants Arnold Foulke, Louis Romano, Edward Hojnacki, Pat Romano, Jerry Henley, Nathaniel Satterwhite and Ronald Lenzi. At trial, Drs. Schepers and Atkinson testified at length about the necessity concerning former asbestos workers for (1) early detection, (2) medical surveillance, (3) avoidance of future exposure to any dust, asbestos or any other suspected carcinogen, (4) the prompt cessation of cigarette smoking, and (5) the avoidance of strenuous work. Moreover, Dr. Mancuso testified that the early detection of each plaintiff's asbestos-related condition would have helped reduce the extent of harm ultimately experienced by each of these plaintiffs. N.T. 18.133–18.135. For these reasons, there is sufficient evidence from which a jury could find that an intentional failure to warn by Philip Carey which Philip Carey knew or believed would be substantially certain to result in harm to plaintiffs was a proximate cause or substantial contributing factor to plaintiffs' individual ultimate asbestos-related conditions.

### (C) *Punitive Damages*

■ Celotex contends that there is insufficient evidence from which the jury could impose punitive damages on Celotex as the successor-in-interest to Philip Carey. The evidence clearly shows that Philip Carey took absolutely no action to contact any of its former employees in the face of Dr.

Mancuso's recommendations in September, 1963, that the company advise its employees of the risks that they contracted an asbestos-related condition. N.T. 23.82–23.85. The pertinent test is whether the conduct of Philip Carey was "outrageous" in that it exhibited a reckless indifference to the rights of plaintiffs. Restatement (Second) of Torts, § 908(2). The Court finds that there is sufficient evidence from which the jury could find that Philip Carey engaged in outrageous conduct. For these reasons, the Court finds that there is sufficient evidence for an award of punitive damages against Celotex because Philip Carey failed to warn the plaintiffs of the risks that each had an asbestos-related condition when Philip Carey knew or believed that a failure to warn of this risk would be substantially certain to cause or aggravate each plaintiff's injuries.

### VI. *Motions for New Trial—Supplier Defendants*

■ Motions for a new trial may be granted where "the verdict is against the weight of the evidence, or that for other reasons the trial was not fair." 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2805, at 37 (1973). A motion for a new trial on the ground that the verdict was against the weight of the evidence is addressed to the sound discretion of the trial court. *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 88–89 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). In the present case, the Court has reviewed all of the evidence presented with respect to the liability of each supplier defendant and is satisfied that the jury's verdict was not contrary to the weight of the evidence presented at trial. Second, the jury's verdict which found that Johns-Manville was additionally liable for punitive damages because of "outrageous conduct" was not contrary to the weight of the evidence presented at trial. Finally, the Court will review each of the contentions raised by the supplier defendants which form the basis for their motions for a new trial.

(A) *Supplier Defendants Generally*

(1) Exclusion of Evidence of Knowledge of Philip Carey

Supplier defendants contend that the Court erred in prohibiting the defendant, Asbestos Corp., from offering evidence of the knowledge of Philip Carey officials at the Lockland, Ohio headquarters. Supplier defendants' offer of proof consisted of excerpts from the depositions of Carl Krieg, Safety Supervisor for Philip Carey; ·Louis Pechstein, Assistant Secretary for Philip Carey; John Cantlon, Actuarial Consultant to Philip Carey; and Michael Muldoon, Officer of Ohio. *See* N.T. 22.3–22.39.

First, supplier defendants contend that this evidence would have established that Philip Carey's pre-1962 conduct was extraordinary and, therefore, a superseding cause of plaintiffs' asbestos-related conditions. The Court reviewed this evidence and noted that even with the offer of proof testimony the defendants had still failed to show the necessary level and proof for a superseding cause defense—i.e., *highly extraordinary or unforeseeable* conduct by Philip Carey. *See* N.T. 22.10–22.16; 22.19. Knowledge of the hazards of asbestos exposure by Philip Carey officials was not probative of highly extraordinary or unforeseeable conduct simply because all of the members of the asbestos industry, including the defendant, had knowledge of the hazards of asbestos exposure during the 1950's. *See* N.T. 21.74–21.77; 21.224–21.225; 21.228–21.233. Nevertheless, evidence of the conditions at Philip Carey's Plymouth Meeting plant had been presented earlier to the jury by the plaintiffs.

■■■■■ Secondly, supplier defendants contend that this evidence was improperly excluded on the issue of proximate causation. The Court excluded this evidence because knowledge or motive was not relevant to the issue of the proximate cause of plaintiffs' injuries. The Court stated at trial:

Isn't it the fact of no dust collectors, the fact of no masks, no signs, that will be the premise for proximate cause, irrespec-

tive of the motive? What difference does it make? I don't think the motive makes any difference in the world if you're talking about what caused the injuries.

• • • • •

It's the fact of the events that could be a proximate cause, not the intent, so I don't think the intent's relevant at all, and I don't think any of this should be read. N.T. 22.34–22.35. The applicable rule of law is that a plaintiff must show that the defendant's conduct was a proximate cause of an injury—i.e., a "substantial contributing factor" in bringing about the harm in order to recover. *Whitner v. VonHintz,* 437 Pa. 448, 263 A.2d 889, 893–894 (1970); Restatement (Second) of Torts, § 431 (1965). In the present case, the conduct of Philip Carey was relevant on the issue of proximate cause; however, the motive or reasons for that conduct was completely irrelevant as to what *caused* plaintiffs' injuries. For these reasons, the Court did not err in excluding this evidence.

(2) Sole Proximate Cause

■■■■■ Supplier defendants contend that the Court erred in failing to provide the following instruction to the jury:

Although you have not been requested specifically to determine whether or not the conduct of Philip Carey was a proximate cause of the plaintiff's condition with regard to the period 1929–1962, you may consider that conduct in determining whether or not the conduct or products of the supplier defendants was a proximate cause of the conditions of the plaintiffs. If you find that the sole proximate cause (ie sole substantial factor) was the conduct of Philip Carey then the conduct of the supplier defendants could not be a proximate cause.

Requested Instruction of Supplier Defendants Docketed as 888. The Court extensively charged the jury on the issue of proximate cause both with respect to the products liability and negligence claims. N.T. 29.54–29.57; 29.63–29.64. Supplier defendants' proposed point for charge was, at most, another form of charging the jury

that if a supplier defendant's conduct was not a "substantial contributing factor" to each plaintiff's injuries, then the supplier defendant could not be held liable for plaintiffs' injuries. It is well settled that a non-employer defendant may defend at trial on the theory that the conduct of the plaintiff's employer was the legal cause of the injury and not that of his own conduct, even though the Pennsylvania Workmen's Compensation Act prohibits joinder of the employer. *Tsarnas v. Jones & Laughlin Steel Corp.*, 262 Pa.Super. 417, 396 A.2d 1241, 1244 (1978), *aff'd*, 488 Pa. 513, 412 A.2d 1094 (1980); *Burke v. Duquesne Light Co.*, 231 Pa.Super. 412, 332 A.2d 544 (1974). The Court allowed the supplier defendants to present this argument at trial and never disputed the right of the defendants to make such an argument to the jury. N.T. 22.21; N.T. 29.125–29.126. For these reasons, the Court did not err in refusing to provide the specific instruction offered by supplier defendants since the Court's general instruction on the issue of proximate cause was sufficient to cover this issue.

(3) Severance of Actions

 Supplier defendants contend that the Court erred in consolidating all fifteen claims for trial. Rule 42(a) of the Federal Rules of Civil Procedure provides that:

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

In this case, all fifteen claims arose out of the exposure of a group of employees working at the same plant over substantially the same period of time to asbestos fiber and dust allegedly supplied to the plant by supplier defendants. All fifteen claims involved common as well as individual questions of law and fact, with the common issues predominating. *See* Pretrial Conference, February 7, 1981, N.T. 11.17. Consolidation of all fifteen claims resulted in considerable judicial economy, as well as the avoidance of unnecessary litigation costs and attendant delay. Supplier defendants have not shown any demonstrable prejudice resulting from the consolidation of all fifteen claims. Special interrogatories were submitted by the Court with respect to each individual plaintiff to be answered with respect to each individual defendant and were so answered by the jury. Moreover, individual summary sheets were provided to the jury for each individual plaintiff which listed the plaintiff's name, dates of employment, and diagnosis by plaintiff's medical expert, Dr. Atkinson. N.T. 27.122. Photographs of the individual plaintiffs were available upon the request of the jury and plaintiffs were present throughout most of the trial. In examining the verdict, it is readily apparent that each plaintiff's case was considered separately and that the liability of each defendant was individually and fully deliberated by the jury. Finally, individual damage hearings were held following the jury's verdict on liability because individual issues of law and fact did predominate in those proceedings. For these reasons, the Court did not abuse its discretion in consolidating all fifteen claims for trial on the liability and damages issues.

(B) *NAAC*

(1) Admission of Plaintiffs' Exhibit No. 191

 Plaintiffs' Exhibit No. 191 is a seven-year summary of NAAC's sales activities for the years 1954 through 1960. NAAC argues that the document was never properly authenticated for receipt into evidence. Nevertheless, Max Meyer, a former director of NAAC, identified the document as a worksheet prepared either by Robert Cryor himself, or under Mr. Cryor's own direction, during the early 1960's. N.T. 24.106–24.107. Mr. Cryor was the past president of NAAC. N.T. 24.98. This authentication testimony was sufficient to allow the document to be admitted as either a business record or as an admission by NAAC.

**(2) Motion for Mistrial**

 NAAC contends that the Court erred in refusing to grant a mistrial because of plaintiffs' counsel's question on redirect examination of Max Meyer concerning whether mesothelioma was the cause of the death of Robert Cryor, the past president of NAAC. The incident occurred on the twenty-fourth day of trial. The Court had sustained NAAC's objection on the ground that the question was irrelevant and denied a motion for mistrial following the luncheon recess. N.T. 24.111–24.113. NAAC argues that the question was clearly prejudicial to NAAC. Nevertheless, while the Court does not condone this type of questioning, in evaluating all of the circumstances at trial, the Court does not find that the tenor of the question was of the type that unfairly prejudiced NAAC to such a degree that would warrant a completely new trial. The Court sustained the objection and no further mention was made by plaintiffs' counsel of the cause of Mr. Cryor's death during the two month trial. For these reasons, NAAC's motion for new trial will be denied.

**(C)** *Carey-Canadian*

**(1) Successorship Issue—Pleadings**

 First, Carey-Canadian contends that the Court erred in allowing the plaintiffs to present evidence that it was the "successor" to Quebec Asbestos Corporation, Ltd. ("QAC") because the issue had never been raised by plaintiffs in their pleadings, pre-trial memorandum or any amendments to these pre-trial submissions. Carey-Canadian specifically contends that QAC was never named as a party in this litigation in either plaintiffs' original or amended complaint and that plaintiffs never alleged that Carey-Canadian was "the successor" to QAC in its pleadings. Moreover, Carey-Canadian cites the absence of any specific allegation by plaintiffs in their pre-trial memorandum that Carey-Canadian was "the successor" to QAC. For these reasons, Carey-Canadian asserts that the plaintiffs should have been precluded from asserting the "successorship" issue at trial

because it was untimely and highly prejudicial. A trial judge has broad discretion to determine whether to admit evidence supportive of a theory not disclosed at pretrial. *Price v. Inland Oil Co.,* 646 F.2d 90, 94–96 (3d Cir. 1981); *Moore v. Sylvania Electric Products, Inc.,* 454 F.2d 81 (3d Cir. 1972). In this case, the Court holds that Philip Carey had adequate notice of the "successorship" theory and that Carey-Canadian was not unfairly prejudiced by the admission of such evidence at trial. First, plaintiffs' complaint satisfied the prerequisites of Fed.R.Civ.P. 8(a) that "a short and plain statement" of the nature and basis of each plaintiff's claim be asserted. Plaintiffs' complaint stated that each plaintiff sought damages because of each claimant's exposure to asbestos fiber furnished by Carey-Canadian and other alleged supplier defendants to the Plymouth Meeting plant from the period 1926–1962. Second, Carey-Canadian had notice of this issue because it provided answers to plaintiffs' interrogatories in July, 1979, almost two years before trial, that it was a successor to the QAC. Moreover, Carey-Canadian never propounded interrogatories or requests for admissions to determine whether plaintiffs would seek to hold Carey-Canadian liable as a successor to the QAC. Finally, the extraordinary length of the trial allowed sufficient opportunity for Carey-Canadian to present a formidable defense to the "successorship" issue and, therefore, no demonstrable prejudice to Carey-Canadian appears on the record. For these reasons, a new trial will not be granted on this ground.

**(2) Successorship Issue—Court's Charge**

 Next, Carey-Canadian contends that the Court erred in its charge to the jury on the issue of successor liability. *See* N.T. 29.31–29.33. Carey-Canadian contends that the Court's charge was "one-sided" and that it improperly commented on the evidence. *See Kornicki v. Calmar Steamship Corp.,* 460 F.2d 1134, 1137 (3d Cir. 1972). In reviewing the charge on the "successorship" issue, the Court finds that it did not express any views respecting the probative value or .

weight of the evidence, but that it merely cited examples of the evidence introduced by both sides at trial from which plaintiffs and Carey-Canadian presented their arguments to the jury. The Court finds that the Court's charge, on balance, was fair and impartial since the Court instructed the jury on three separate occasions that Carey-Canadian could not be held liable for asbestos fiber supplied by the QAC corporate entity if Carey-Canadian was not a continuation of QAC. N.T. 29.31, lines 22–25; N.T. 29.32, lines 21–23; N.T. 29.33, lines 15–16. The Court's Esso-Exxon illustration was merely submitted as an aid for the jury and was not unfairly prejudicial. For these reasons, the Court did not err in its charge to the jury.

### (3) Successorship Issue—Special Interrogatories

 Carey-Canadian contends that the Court erred in failing to frame a special interrogatory to the jury which would ask the jury to determine (1) whether QAC supplied asbestos fiber to the Plymouth Meeting plant to which plaintiffs were exposed, and (2) whether Carey-Canadian was the successor to QAC. Pursuant to Fed.R. Civ.P. 49, a trial judge has wide discretion in determining the form of the special verdict and written interrogatories submitted to the jury. *Kornicki v. Calmar Steamship Corp.*, 460 F.2d 1134, 1139 (3d Cir. 1972). The only limitations imposed upon the Court's discretion is that the interrogatories be adequate to determine the factual issues essential to the judgment in the case and that the interrogatories be fashioned in such a manner that valid theories of recovery or defenses are not withdrawn from consideration by the jury in the case. *Kornicki v. Calmar Steamship Corp., supra.* In the present case, the Court submitted a special interrogatory to the jury with respect to each claimant which asked whether the plaintiff was exposed at his place of employment to asbestos fiber supplied by Carey-Canadian Mines. The Court specifically instructed the jury that they could find Carey-Canadian liable if they supplied asbestos fiber to which plaintiffs were ex-

posed after they came into existence in 1955 or if the jury found that plaintiffs were exposed to fiber supplied by QAC prior to the formation of Carey-Canadian if Carey-Canadian was found to be a successor to QAC. N.T. 29.30–29.34. The Court's charge was sufficiently clear for the jury to determine whether Carey-Canadian, either as Carey-Canadian or as the successor to QAC, had supplied asbestos fiber to which each plaintiff had been exposed. For these reasons, the Court did not err in its framing of the special interrogatories.

### (4) Limitation of Argument

 Finally, Carey-Canadian argues that the Court erred in limiting its argument to thirty minutes. A trial court has wide discretion in allotting the time and extent of counsel's summation. *Wagner v. Pennsylvania R. Co.*, 282 F.2d 392, 396 (3d Cir. 1960). In this case, counsel for each defendant was permitted thirty minutes for summation; however, the Court was willing to allow forty-five minutes if necessary. N.T. 26.70–26.71. There were five supplier defendants in addition to Celotex. Plaintiffs had been allotted three hours for their summation. N.T. 26.72. Under all of the circumstances, the Court's allotment of time was fair and reasonable and defendants have not shown any prejudice resulting from the time limitations imposed upon their arguments.

### (D) *Johns-Manville*

#### (1) Admission of Dr. Kenneth Smith's Deposition

 Johns-Manville contends that the court erred in allowing the admission of the former deposition testimony of Dr. Kenneth Smith. Johns-Manville argues that there was an absence of the requisite identity of parties or substantial similarity of issues or motives for cross-examination between this action and the two cases for which Dr. Smith was deposed. The two depositions were taken in *DeRocco v. Forty-Eight Insulations, Inc.*, No. 7407–2880, 2881 (Allegheny C.C.P.), on January 13, 1976, in Pitts-

burgh, Pa.; and in *Louisville Trust Co. v. Johns-Manville Corp.,* No. 164–922 (Jefferson Cir.Ct.C.P. Branch, 7th Div. Kentucky, 1972), on April 21, 1976, in Windsor, Ontario, Canada. Dr. Smith was not available as a witness at trial because of his death some years earlier.

Fed.R.Evid. 804(b)(1) provides:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The Court finds that Johns-Manville had a sufficient opportunity to cross-examine Dr. Kenneth Smith and a similar motive to develop the testimony by direct, cross, or redirect examination because of the substantial similarity of the issues in the cases when the depositions were taken and the instant case. First, Dr. Kenneth Smith was a high ranking official of Johns-Manville, which was a defendant in both cases. Second, both cases were suits based on negligence, strict liability and breach of warranty against Johns-Manville because of plaintiffs' exposure to asbestos products manufactured by Johns-Manville. No reasonable distinction can be drawn from the fact that the plaintiffs in the former two cases were insulation workers exposed to asbestos-containing insulation products from the instant case where plaintiffs were plant workers exposed to raw asbestos fiber. In each case, the asbestos fiber and dust was the cause of plaintiffs' asbestos-related conditions. Third, both depositions were taken by plaintiffs for use against Johns-Manville. Fourth, there is a suffi-

cient identity of issues to allow admission of these former depositions because the depositions were taken for purposes of showing the knowledge of Johns-Manville officials about the dangers of asbestos. The same issue was readily present in the former two cases and, thus, Johns-Manville had a motive to protect itself through cross-examination. Fifth, any contention that they were taken for discovery purposes only is without merit because such deposition testimony could still be used at trial. Finally, no technical objections to the admission of the depositions can be sustained because the depositions were taken and recorded in substantial compliance with the applicable rules for the admission of depositions necessary to assure that the testimony contained in those depositions was that which was actually offered by the witness during the taking of the depositions. With respect to Dr. Smith's deposition in Pittsburgh, Dr. Smith had submitted a signed correction sheet after he had reviewed the deposition which noted his corrections and the approval of his deposition. N.T. 5.245.25. With respect to the deposition taken in Ontario, Canada, any submittal of the deposition to the witness for reading and signature was waived by counsel for failure to make such a timely request to the court reporter who recorded the deposition testimony. For these reasons, the Court did not err in the admission of the former deposition testimony of Dr. Smith.[8]

(2) Admission of Exhibits to Smith Deposition

■ Johns-Manville contends that the Court erred in the admission of certain Johns-Manville memoranda which discuss the impact of Dr. Smith's study of asbestos hazards at Johns-Manville because they lack relevance to this case. This argument is without merit because these documents were relevant for purposes of demonstrating knowledge of the dangers of asbestos exposure by Johns-Manville corporate officials which was a key in the jury's assess-

---

**8.** *See also Noecker v. Johns-Manville Corp., et al.,* No. 336 (118) April Term, 1977 (Ct. Common Pleas, Philadelphia County, April 28, 1982)

(also allowing the admission of Dr. Smith's deposition testimony).

ment of the conduct of Johns-Manville for purposes of punitive damages. For these reasons, the Court did not err in the admission of these exhibits.

### (3) Admission of James Hutchinson Deposition

■ Johns-Manville contends that the Court erred in the admission of the deposition testimony of James Hutchinson with respect to the development of its asbestos fiber bags after the year 1962 because the plaintiffs were no longer exposed to such asbestos fiber following the closing of the Plymouth Meeting plant. First, no error was committed because the evidence was probative on the issue of whether the asbestos bags were defective because they allowed asbestos fibers to sift out of the bags and contaminate the entire plant. Second, no unfair prejudice resulted from the admission of this testimony because the Court did not allow the issue of the defectiveness of the asbestos bags to go to the jury because of plaintiffs' failure to introduce sufficient evidence on the defectiveness of the asbestos bag containers. For these reasons, the Court did not err in the admission of this testimony.

### (4) Punitive Damages

■ Johns-Manville contends that the trial court erred in allowing the jury to award damages against all of the Johns-Manville defendants instead of just Canadian Johns-Manville and Johns-Manville Sales Corporation. This contention is totally without merit since Johns-Manville Corporation is the parent corporation for all of the Johns-Manville subsidiary corporations and Johns-Manville Corporation exercised its decision-making authority with respect to all of these subsidiaries which resulted in the damages due to the plaintiffs. N.T. 35.4–35.6. All of the Johns-Manville subsidiary corporations, which mined and sold asbestos fiber, were wholly-owned subsidiaries of the parent corporation, Johns-Manville Corporation. Similarly, the officers and members of the board of directors of the various subsidiary corporations were identical to that of the officers and board of directors of the parent corporation. N.T. 20.69–20.77; 33.33–33.37; N.T. 35.435.6. For these reasons, damages could be awarded against all of the Johns-Manville defendants identified by the Court to the jury as the Johns-Manville defendants.

### (5) Admission of Johns-Manville Financial Statement

■ Johns-Manville contends that the Court erred in allowing punitive damages to be assessed on the basis of the consolidated Johns-Manville financial statement. The Court did not err because Johns-Manville Corporation, as the parent corporation, made the controlling decisions which resulted in plaintiffs' injuries. N.T. 35.6. Moreover, evidence of a defendant's financial position is readily admissible for the jury's determination of a punitive damages award. *Arye v. Dickstein,* 337 Pa. 471, 12 A.2d 19 (1940); *Hughes v. Babcock,* 349 Pa. 475, 37 A.2d 551 (1944); Restatement (Second) of Torts, § 908(2) and comment e. For these reasons, the Court did not err in the submission of Johns-Manville's consolidated balance sheet for consideration by the jury on the punitive damages issue.

### (6) Offer of Proof of Impact of Punitive Damage Awards

■ Johns-Manville contends that the Court erred because it did not permit Johns-Manville to present testimony on the impact of asbestos-related personal injury lawsuits filed against them for purposes of the punitive damage awards. Comment e to section 908 of the Restatement (Second) of Torts provides:

Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards.

Johns-Manville offered to present evidence that over 9500 asbestos suits were presently pending against Johns-Manville at the time of trial and that this contingent liability could seriously affect the future financial status of the company. N.T. 34.18. The Court disallowed this offer of proof because it was too speculative and vague. N.T. 34.18–34.24; however, the Court did allow Johns-Manville to read to the jury the accountant's report in the 1980 annual Johns-Manville report which stated that Johns-Manville was heavily involved in asbestos health litigation, and the accountant's projection that such litigation presented a possibility for ultimate liability which could adversely impact upon Johns-Manville's financial position. N.T. 35.22–35.24. Thus, this evidence was presented and made known to the jury. Moreover, the Court noted that past awards of punitive damages would be certainly relevant. N.T. 34.25–34.27. Johns-Manville conceded that no punitive damages had been assessed against Johns-Manville Corporation in asbestos litigation prior to this case. N.T. 34.23. For these reasons, the Court did not err in disallowing Johns-Manville's offer of proof as stated.

### (7) Submission of Financial Statement During Damages Stage

■ Next, Johns-Manville contends that the Court erred in allowing the jury to consider the financial statements when it considered the compensatory damage issue. In effect, Johns-Manville argues that the issue of punitive damages should have been severed at the damages stage. The Court instructed the jury that the Johns-Manville financial statements were only relevant to the issue of an award of punitive damages. Moreover, the Court instructed the jury that the plaintiff had the burden of proof with respect to both compensatory and punitive damages. A review of the evidence presented at the damages stage and a comparison with the amount of the verdicts rendered readily reveals that the jury did not make an improper misuse of the financial statements submitted which were only submitted for the purpose of assessing puni-

tive damages. For these reasons, the Court did not err in severing the punitive damages issue.

### (8) "Most Innocent" Rule

■ Johns-Manville contends that the Court erred in failing to instruct the jury that punitive damages are to be assessed according to the acts of the most innocent defendants. This rule was first announced by the Pennsylvania Supreme Court in *McCarthy v. DeArmit,* 99 Pa. 63, 72 (1881). The rule is best summarized as follows:

> . . . in joint actions of trespass all defendants are alike guilty and each is liable for damages sustained without regard to the different degrees or shades of guilt, and that the verdict should be for one amount against all the defendants for such sum as the most culpable ought to pay: *McCarthy v. DeArmit,* 99 Pa. 63, 72. There is an exception to this rule which is that when a joint action is maintained and exemplary damages are claimed, they are to be assessed according to the acts of the most innocent of the defendants: *Huddleston v. Boro. of West Bellevue,* 111 Pa. 110, 123, 2 A. 200; *MacHolme v. Cochenour,* 109 Pa.Superior Ct. 563, 570, 167 A. 647. It is true, however, that two persons may be liable, one for punitive damages and the other only for compensatory damages, of which a familiar example is the case where a plaintiff is arrested by a police officer and another, one acting in good faith and the other maliciously. *In such case, if the plaintiff means to get exemplary damages he should proceed against them separately: McCarthy v. DeArmit, supra; Clark v. Newsam & Edwards,* 1 Exc. 130.

*Randall v. Fenton Storage Co.,* 121 Pa.Super.Ct. 62, 65, 182 A. 767 (1936) (emphasis added). The *McCarthy* rule was premised on the old common law doctrine that in a suit against joint tortfeasors the plaintiff was entitled to only one verdict and one judgment against all the defendants found to be liable to plaintiff. *See MacHolme v. Cochenour,* 109 Pa.Super. 563, 167 A. 647 (1933). The "most innocent" rule served to

protect a joint tortfeasor from the imposition of punitive damages against that defendant based upon the conduct of another defendant against whom the evidence of outrageous conduct had been presented at trial. However, a plaintiff can now proceed separately against joint tortfeasors in Pennsylvania. *See Hilbert v. Roth,* 395 Pa. 270, 149 A.2d 648 (1959). Moreover, punitive damages could be secured in a multiplicity of actions by proceeding separately against each defendant notwithstanding the rule announced in *McCarthy.* Pennsylvania law, however, presently encourages joinder of joint tortfeasors in the same action, Pa.R. C.P. 2229(b), with trial to be held as if each defendant had been separately sued and the causes consolidated. Pa.R.C.P. 2231(c). In this case, the jury was instructed that the jury could only consider the conduct of Johns-Manville in determining whether to assess punitive damages against *that* defendant—Johns-Manville, and not with respect to any other defendant. For these reasons, the jury could not impute the outrageous conduct of Johns-Manville against any of the other joint tortfeasors in assessing a punitive damages award. For these reasons, the Court holds that the *McCarthy* rule did not apply under the circumstances of the present case, and that the Court did not err in refusing to give this "most innocent" instruction to the jury.

(9) Comments of Plaintiffs' Attorneys

■■■ Johns-Manville contends that certain comments of plaintiffs' attorneys during closing summations were improper and overly prejudicial so as to warrant a new trial. The conduct of counsel is within the sound control and discretion of the trial judge. *Arkwright Mutual Ins. Co. v. Philadelphia Electric Co.,* 427 F.2d 1273, 1277 (3d Cir. 1970). It is a matter for the trial judge's discretion to weigh the alleged prejudicial remarks and to make a determination as to whether they are so prejudicial as to affect the fairness of the trial. *Corbett v. Borandi,* 375 F.2d 265, 270 (3d Cir. 1967). In this case, the Court has considered all the circumstances and the nature and extent of the objected to remarks. The Court finds

that, under all the circumstances, a completely new trial is not warranted in this case.

VII. *Motion for New Trial—Celotex*

■■■ First, the Court has reviewed all of the evidence presented with respect to Philip Carey, as the predecessor to Celotex, and is satisfied that the jury's verdict with respect to liability was not contrary to the weight of the evidence presented at trial. Moreover, a new trial is not warranted on the punitive damages issue with respect to Celotex because the jury's verdict awarding punitive damages was not contrary to the weight of evidence presented at trial. Finally, the Court will review each of the contentions of error raised by Celotex which form the basis for its motion for a new trial.

(1) Interrogatories to the Jury

■■■ Celotex contends that the Court erred in failing to submit a special interrogatory to the jury which would have required the jury to specifically answer whether or not Philip Carey, in failing to follow the advice of Dr. Mancuso, knew that there was a "substantial certainty" that its conduct was going to result in harm to plaintiffs. A trial judge has wide discretion in determining the form of special interrogatories to be submitted to the jury. *Kornicki v. Calmar Steamship Corp.,* 460 F.2d 1134, 1139 (3d Cir. 1972). In the present case, the Court submitted the following interrogatory on the issue of the liability of Philip Carey for an intentional tort:

III. AS TO PHILIP CAREY MANUFACTURING COMPANY (CELOTEX) ONLY

12. Did this defendant intentionally fail to warn this plaintiff at any time after October 1, 1963, that this plaintiff might have acquired an asbestos-related disease by reason of his exposure to asbestos during his employment at the Philip Carey Manufacturing Plant?

YES ___ NO ___
(If your answer is "yes," answer question 13; if "no," answer question 15.)

Celotex argues that the Court erred in failing to submit a second interrogatory or

failing to modify the present interrogatory in such a manner so that the jury would have to answer whether or not Philip Carey was "substantially certain" that its conduct, if found to be an intentional failure to warn, was going to result in harm to plaintiffs. The Court holds, however, that no prejudicial error was committed since the Court carefully instructed the jury that they could only answer "yes" to this interrogatory if they found "by a preponderance of the evidence that Philip Carey intended to do an act or intended to fail to do an act that Philip Carey knew or believed would be *substantially certain* to cause harm to the plaintiff." N.T. 29.83–29.84. The Court defined "intentionally" as "not simply limited to bringing about physical results" but that it "extends to those consequences which the actor, in this case, Philip Carey, believes are *substantially certain* to follow from what he does or does not do." N.T. 29.81–29.82. The Court instructed the jury on four separate occasions that it could only answer "yes" to this interrogatory if they found that Philip Carey intended to do an act or fail to warn which it believed would be *substantially certain* to cause harm to the plaintiffs. N.T. 29.81, lines 29–25—29.81A, lines 1–3; N.T. 29.83, lines 21–25; N.T. 29.84, line 1; N.T. 29.84, lines 15–20; N.T. 29.84, lines 1–8. For these reasons, the Court did not err because of its repeated explicit instructions that Philip Carey must have had the requisite intent—desire to cause consequences of the act, or belief that harm is substantially certain to result—before Celotex could be found liable on the basis of an intentional tort.

(2) Punitive Damages—Multiple Torts

■ Celotex contends that the Court erred in allowing the jury to impose multiple punitive damage awards for the same conduct of Philip Carey. Celotex contends that an initial award of punitive damages prohibits successive punitive damage awards because the specific conduct was punished by the first award to the first plaintiff. Celotex's argument must be rejected for the same reasons as that which the Court posited with respect to Johns-Manville. Philip Carey's conduct is separate and distinct with respect to each plaintiff in failing to warn of the risks that each individual plaintiff contracted an asbestos-related condition. The twin goals of punishment and deterrence are served by separate awards of punitive damages because of a jury's finding that the tortfeasor engaged in "outrageous conduct" with respect to each individual plaintiff.

(3) Punitive Damages—Consideration of Past Awards

■ Next, Celotex contends that the Court erred in refusing to allow counsel for Celotex to argue during summation that the jury could consider that they had already awarded punitive damages in the first plaintiff's case and thereafter and that this factor should be considered by the jury with respect to any future punitive damage awards. Comment e to the Restatement (Second) of Torts, § 908 explicitly provides:

Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. *It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards.* In a class action involving all claims, full assessment of the punitive damages can be made.

(Emphasis added). The Court stated its agreement with this principle earlier during the damages stage. *See* N.T. 34.25–34.27. The specific colloquy between counsel and the Court on this point was as follows:

MR. MALCOLM: Your Honor, I would like to advise the Court of an argument I consider making, and you can advise me now, to let me know if I should not do that.

I was thinking of arguing to the jury that the purpose of punitive damages is not to award the plaintiff, rather, that is taking care of by compensatory damages; not to in any way award the plaintiff. That is the purpose of compensatory damages.

Punitive damages are imposed, as they have been told, for punishment and for deterrence. And without quarreling at all to the amount of punitive damages, that they have assessed in the first two cases, to make comment that they have twice punished the same conduct and they can consider whether or not that conduct is to be punished, that very same conduct to be punished yet again, and that's something they can consider in determining the amount to be imposed for the purposes of punishment.

THE COURT: That argument will not be allowed because they have not imposed punishment on your client for Louis Romano.

N.T. 40.24. The context of this colloquy was understood by the Court to be that of the argument that successive punitive damage awards were prohibited as a matter of law. *See* N.T. 40.23–40.25 (context of argument). Celotex's counsel's offer was vague and ambiguous and at no time cited the pertinent authority of comment e to § 908 of the Restatement (Second) of Torts on this point. Celotex never asked for reconsideration by submitting a brief or specifying the exact contours of this argument by citing the pertinent authority for the argument. Because of this total lack of clarity in counsel's presentation of the objection at the time of trial, any objection by Celotex was never properly preserved. Moreover, even if any error is to be found, it is harmless error, under all of the circumstances of the case, because the jury was well aware of their prior punitive damage awards without it being argued to the jury. This jury was not a virgin jury who would not have known of such prior punitive damage awards in this case. The first punitive damages ever assessed against Celotex (or Johns-Manville) with respect to these issues was that of this very case. The jury was well aware of their own punitive damage finding rendered days before. The amount of their later punitive damage awards reflect this awareness. Thus, nothing could have been gained by further argument to the jury on this point. For these reasons, the objection was never properly preserved

and any error, if so committed, was harmless to defendants under all the facts and circumstances presented at trial.

**(5) Punitive Damages—Successor Corporation**

██ Celotex contends that the Court erred in permitting the jury to consider and award punitive damages against Celotex based upon the conduct of its predecessor-in-interest, Philip Carey. This argument is without merit since a successor corporation is liable for the torts arising out of the conduct of its predecessor corporation including that of punitive damages because the successor is essentially identical to that of the predecessor corporation. *Moe v. Transamerica Title Insurance Co.*, 21 Cal. App.3d 289, 98 Cal.Rptr. 547, 557 (1971); *see generally* 15 Fletcher, *Cyclopedia of Corporations,* ¶ 7123.

**(6) Consideration of Compensatory and Punitive Damages Simultaneously**

██ Celotex contends that the Court erred in permitting the jury to consider and determine the issues of compensatory and punitive damages in one proceeding. This contention is without merit since the Court found that it was in the best interests of all parties within the relevant concerns of judicial economy and expediency to try all the damage issues with respect to each plaintiff during a single damages stage. No unfair prejudice resulted to defendants and a new trial is, therefore, not warranted on this ground.

**(7) Evidentiary Rulings**

██ Finally, Celotex contends that the Court made certain errors in its evidentiary rulings. First, Celotex contends that the Court erred in permitting counsel for plaintiffs to cross-examine Louis Pechstein regarding a letter that Mr. Pechstein had written to John Cantlon on November 4, 1969. *See Plaintiffs' Exhibit No.* 246 (397); N.T. 25.159–25.162. This letter was offered on the issue of the credibility of the witness. Fed.R.Evid. 608(b). The letter requested that a short, evasive answer be

furnished by Mr. Cantlon for an interrogatory submitted by a plaintiff with respect to the coverage of the Ohio's Workmen's Compensation Law in a common law asbestosis suit pending against Celotex. In weighing the probative value against the danger of unfair prejudice, the Court did not abuse its discretion in allowing cross-examination on this point because of the probative value of this testimony on the credibility and truthfulness of the witness, Mr. Pechstein. *See generally United States v. Bocra,* 623 F.2d 281, 287–288 (3d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980) (discussion of discretion of trial court in weighing probative value vs. unfair prejudice). This evidence was, thus, admissible under Fed.R.Evid. 608(b) and no error was committed.

■ Second, Celotex contends that the Court erred in permitting plaintiffs' counsel to cross-examine John Cantlon concerning correspondence he had with Dr. Mancuso and Mr. Louis Pechstein subsequent to the termination of Dr. Mancuso's contractual relationship with Philip Carey in October, 1963, because it was beyond the scope of the direct examination. *See* N.T. 25.84–25.105. Rule 611(b) of the Federal Rules of Evidence provides:

> (b) Scope of cross-examination. Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

These letters, dated November, 1963 through December, 1964, exhibited Dr. Mancuso's continued commitment to warn Philip Carey of the dangers of asbestos exposure and to urge Philip Carey to warn its employees of this danger. The Court did not abuse its discretion in allowing cross-examination on this material which was relevant to the factual question whether Philip Carey committed an intentional tort and which was probative of the truthfulness of Mr. Cantlon's testimony whether Dr. Mancuso expressed a sincere interest in warning the former employees of the Plymouth Meeting facility of this danger.

## VIII. *Motion for Judgment N. O. V. and/or New Trial—Plaintiffs*

### (A) *George Neal—Statute of Limitations*

■ The Estate of George Neal contends that defendants did not produce sufficient evidence to support the jury's finding that the claim of George Neal was barred by the Pennsylvania statute of limitations. Evidence was presented at trial that George Neal was a former personnel manager of the Plymouth Meeting plant and that he was responsible for the health and safety of the plant's employees. Reasonable inferences can be drawn from the evidence that Mr. Neal knew of the dangers of asbestos exposure by virtue of his management position and his access to information about asbestos in that position. *See, e.g.,* N.T. 4.54–4.56; 5.39–5.41; 5.45–5.46. Evidence was presented that Mr. Neal had contracted his lung condition prior to November 28, 1976. For these reasons, there is sufficient evidence present in the record from which the jury could find that George Neal knew or had reason to know prior to November 28, 1976, that he had an asbestos-related condition caused by his exposure to asbestos fiber at the Plymouth Meeting plant. Plaintiff's motion for judgment n. o. v. and/or new trial will be denied.

### (B) *Bell Asbestos Mines, Limited*

■ Plaintiffs contend that a new trial should be granted against Bell Asbestos because the weight of the evidence established that Bell Asbestos supplied fiber to Philip Carey's Plymouth Meeting plant to which each plaintiff was exposed. Plaintiffs argue that they showed through circumstantial evidence that Bell's fiber was present at the plant by reason of the testimony that asbestos fiber was supplied in bags with a bell shaped logo on the bag and the testimony that established the *existence* and likelihood that such fiber was obtained from the nearby Keasby-Mattison plant. Nevertheless, Bell Asbestos presented sufficient evidence through the testimony of

Earl Bauer, Manager of the Plymouth Meeting plant; Arthur Mueller, head of Philip Carey's Research and Development Department; Lee Clayton, Purchasing Agent for all of the Philip Carey plants; and Joseph Lobb, Assistant Purchasing Manager for the Plymouth Meeting plant, that Bell Asbestos was *not* a supplier of asbestos fiber to the Plymouth Meeting plant. For these reasons, plaintiffs' motion for judgment n. o. v. and/or new trial against Bell Asbestos will be denied.

**(C)** *Apportionment of Damages Between Celotex and Supplier Defendants*

■ Plaintiffs argue that the Court erred in permitting the jury to apportion damages between Celotex and the supplier defendants. Plaintiffs contend that since Celotex was not jointly liable and since the jury found that the conduct of Celotex was distinct from that of the supplier defendants, there was no reasonable basis on which damages could be apportioned between Celotex and the supplier defendants. Plaintiffs argue that independent damages caused by Celotex should have been awarded to plaintiffs. This argument is without merit by reason of the fact that the apportionment of damages between Celotex and the supplier defendants was both factually and legally appropriate under all of the circumstances of this case. Restatement (Second) of Torts, §§ 434(1)(b) and (2)(b). In *Lasprogata v. Qualls,* 263 Pa.Super. 174, 397 A.2d 803 (1979), the Pennsylvania Superior Court affirmed a lower court order which apportioned plaintiff's ultimate damages between a tortfeasor who originally caused the injury and a physician who subsequently aggravated or caused a new injury. The court held that "where identifiable acts of negligence of the original wrongdoer and the negligent physician are separate from each other in nature and time, the damages are accordingly apportionable." *Id.* at 180, 397 A.2d at 806. The present case is almost identical to that of the facts in *Lasprogata.* In the present case, the supplier defendants, who supplied asbestos fiber without warning to the Plymouth Meeting plant to which the plaintiffs were

ultimately exposed, were found by the jury to be liable as joint tortfeasors because they originally caused plaintiffs' injuries. Philip Carey was found to have aggravated plaintiffs' injuries by intentionally failing to warn the plaintiffs that they were at risk because they might have acquired an asbestos-related condition originally caused by exposure to asbestos fiber supplied by the supplier defendants. For these reasons, the Court did not err in apportioning plaintiffs' compensatory and consortium damages between the original tortfeasors and Philip Carey, the latter which aggravated plaintiffs' injuries by intentionally failing to warn the plaintiffs of their asbestos-related conditions. A new trial against Celotex will not be granted on this ground.

**(D)** *In Camera Examination of Two Jurors*

Plaintiffs contend that the Court erred in its selection of a procedure for meeting *in camera* with two jurors, each on separate occasions, who, without any encouragement by the Court, requested to speak directly with the Court. Plaintiffs argue that a mistrial should have been declared with respect to the damages trials.

Following a nine to one verdict in the Salvatore Pascale damage trial, which was accepted both by the plaintiffs and defendants and which was the sixth damages trial held, the Court received the following note from one of the jurors:

> Your honor,
>
> I request a meeting with you, one on one,
>
> > Thank you,
> >
> > /s/ Juror

The Court immediately advised the parties of the contents of this note but did not reveal the name of the juror. N.T. 47.3–47.4. Plaintiffs did not take exception to the Court speaking with the juror *in camera;* however, plaintiffs requested that they be provided with the *in camera* transcript immediately after the *in camera* meeting. N.T. 47.10. The Court advised the plaintiffs that it would take under advisement whether or not to release the *in camera* transcript for inspection until after

the conclusion of all of the damages hearings, depending upon what was said at the *in camera* meeting. N.T. 47.10–47.13. Thereafter, the Court met with the juror. *See In Camera Voir Dire of Minority Juror in Pascale Damage Verdict.* During this brief meeting, the juror expressed his concern that the amount of damages awarded by the jury in each damages case represented his "minimum figures." *Id.,* at 9. However, the juror assured the Court that he had agreed with all of the damage verdicts returned by the jury except that of the Salvatore Pascale case in which the parties accepted the nine to one verdict:

Q. So could we begin with that and why don't you just tell me what is on your mind?

A. Part of the problem was the thought process going on in the juryroom.

Q. The thought process?

A. The way of deliberations. And I can understand that we are all—

Q. You said, "The thought process"?

A. Yes.

Q. Okay.

A. The reasoning of the case.

Q. Okay.

A. I can see how ten different people are going to come up with ten different figures and everybody is not going to have the same figures. We have to compromise. I can go along with that.

Q. You mean consider others' views and things like that and say, "Well, yes, I understand that, but I am not willing to go this far," that type of thing?

A. Yes.

Q. Okay.

A. I have gone along with some of the decisions that were my minimum figures. I accepted it. And that's why I went along with it.

In this particular one yesterday I couldn't go along with the reasoning.

*Id.,* at 8–9. The Court instructed the juror to continue to discuss all the viewpoints offered in the juryroom and to seek a verdict upon which all the jurors could agree which they would deem proper and just under all the facts of the case and the law

as instructed by the Court. Thereafter, the juror expressed his willingness to continue as a juror and, also, his perception that each of the verdicts previously rendered except that of the nine to one verdict in the Salvatore Pascale case had been fair and reasonable under all the evidence presented in each case. *Id.,* at 24–25. Immediately after the *in camera* meeting, the Court advised all counsel that the Court was convinced that the juror fully understood his duties as a juror, that he was qualified to continue to serve as a juror, and that his ability to serve as a juror had not in any way been impaired. N.T. 47.16. Later that day, as soon as a portion of the transcript could be transcribed by the court reporter, the court revealed the substance of the *in camera* meeting and read the pertinent excerpts from the transcript to all counsel. N.T. 47.99–47.100.

The next day, plaintiffs submitted proposed questions to be asked of the jury panel which would inquire into the jury's deliberative process in arriving at each of the previous damage verdicts rendered by the jury. *See* N.T. 48.16; *Proposed Plaintiff's Questions to be Propounded to the Jury Panel Subsequent to the Court's Interrogatories of a Juror Who Would Not Join in the Verdict.* The Court reviewed each question proposed by plaintiffs and properly ruled that such questions were impermissible and could not be asked of the jury because they improperly inquired into the deliberative process of the jury. *United States v. Jelsma,* 630 F.2d 778, 779 (10th Cir. 1980) ("court may not examine the factors influencing [a juror] to assent or dissent from the verdict"); *United States v. D'Angelo,* 598 F.2d 1002, 1005 (5th Cir. 1979) ("The necessary consequence of the rule against examination of the jury's mental process is that convictions must stand despite the presence of plausible suspicion that the jury's mental process was ill-conceived."); *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148–150 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976); Fed.R.Evid. 606(b). Thereafter, a second note was received from a different juror which stated:

I want to speak to Judge

/s/ Juror

N.T. 48.41. Counsel agreed that the Court should meet with the juror *in camera* to learn of the juror's question. During the meeting, the Court learned that the juror wanted to know whether the damage awards should include the possible costs of legal fees and court costs. N.T. 48.62. *See Voir Dire of Juror Who Had a Question,* at 16. The Court advised counsel of this question, N.T. 48.62, and instructed the full jury that they should not include the possible cost of legal fees and court costs in their damage awards. N.T. 48.73–48.74.

▮▮▮ Plaintiffs now contend that the Court erred in the procedure followed by the Court in conducting the *in camera* examination of the two jurors in seeking a new damages trial for each plaintiff. Plaintiffs do not suggest that the substance of the Court's conversations with either juror was in error or that any actual prejudice resulted from the substance of the Court's discussions with the two jurors. Rather, plaintiffs contend that the procedures followed by the Court were in error as a matter of law because the Court had contact with the two jurors. In *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), cited by plaintiffs in support of their arguments, the United States Supreme Court concluded upon its review of the record below that, under the circumstances surrounding the deliberation of the jury in a lengthy antitrust case, the trial court had "encroached on the jury's authority" and had improperly foreclosed a possible no verdict outcome because of its *ex parte* communications with the foreperson of the jury on the seventh day of the jury's deliberations. The court stated:

> Because neither counsel received a full report from the judge, they were not aware of the scope of the conversation between the foreman and the judge, of the judge's statement that the jury should continue to deliberate in order to reach a verdict, or of the real risk that the foreman's impression was that a ver-

dict "one way or the other" was required. Counsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction. . . . *Thus, it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone—undesirable as that procedure is— which constitutes the error; rather, it is the fact that the ex parte discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.*

*Id.* at 461–462, 98 S.Ct. at 2885–2886 (emphasis added and citations omitted). In the present case, counsel were immediately notified of the substance of the Court's conversations with each of the jurors. N.T. 47.3–47.4; 47.16; 47.99–47.100; 48.41. A review of the record discloses no encroachment on the jury's authority by the Court to return whatever it deemed to be a proper verdict in the damages trials. The Court met with each of the jurors at the juror's request and counsel agreed that the *in camera* meetings should be held. *Ex parte* communications by the Court with a juror, although to be avoided, do not constitute grounds for a new trial *unless* prejudice to the parties can be shown. *See Powell v. Kroger Co.,* 644 F.2d 1245 (8th Cir. 1981). Here, no prejudice has been shown by plaintiffs which may have resulted from the manner that the Court conducted the *in camera* examinations or the fact that plaintiffs were not immediately provided the full *in camera* transcript. The Court revealed the substance of the communications to counsel immediately after the *in camera* meetings and read the pertinent excerpts of the transcripts, which were transcribed by Court Order, to counsel at trial. Although plaintiffs may be disappointed in the ver-

dicts in some instances, a new trial can not be granted on this ground because the procedure followed by the Court was not in error nor did any unfair prejudice, in any event, result therefrom. For these reasons, the motion for a new damages trial will be denied.

(E) *Adequacy of Damage Verdicts*

 Plaintiffs assert that a new trial is warranted because the amount of damages awarded to each plaintiff was so grossly inadequate so as to shock the conscience of the Court. *See* 6A *Moore's Federal Practice* ¶ 59.08[6] (2d ed. 1982). The Court has reviewed the amounts of the verdicts set forth earlier and all of the facts and circumstances of each individual plaintiff's case. The Court holds that each verdict was returned within a proper realm of damages which could have been awarded under the facts and circumstances of each case. Therefore, the motions for new damages trials will be denied.

(F) *Scheduling of Individual Damage Claims*

 Finally, plaintiffs contend that the Court erred in its scheduling of the individualized damage trials. Plaintiffs suggest that the Court's adherence to its strict schedule prevented the plaintiffs from calling as witnesses the treating family physi-cians in each of their cases to their prejudice. This argument is totally without merit since the plaintiffs never objected to the commencement of any damages case on the date that it started because a proposed witness was unavailable. Plaintiffs presented the testimony of Dr. Atkinson on the damages issue for each plaintiff and offered no further medical evidence in a stated offer of proof. Finally, the Court specifically set forth the ground rules for the commencement of each damages case following the return of the jury's verdict on the preceding case during the first damage case. N.T. 37.8–37.10. Thus, adequate notice was provided by the Court from which all the parties could determine their scheduling needs and be able to raise to the Court prior to the commencement of each damage trial any scheduling difficulties.

IX. *Conclusion*

For the foregoing reasons, each plaintiffs' and defendants' motions for judgment n. o. v. and/or new trial will be denied.

An appropriate Order will be entered.

APPENDIX A

The following interrogatories were submitted to the jury by the Court with respect to each individual plaintiff at the liability trial:

CIVIL ACTION NO. 78–4242

---

THIS PLAINTIFF

I. AS TO ALL DEFENDANTS

1. Did this plaintiff, on or before November 28, 1976:

(A) know or have reason to know that he had a form of disease?
YES ____ NO ____

(B) know or have reason to know that it had been caused by his exposure to asbestos fiber? YES ____ NO ____

(C) know or have reason to know that there was a causal relationship between his disease and that exposure to asbestos by reason of his employment at the Philip Carey Manufacturing Plant? YES ____ NO ____

(If you answer "yes" to (A) and (B) and (C), answer no more questions; if "no" to either (A) or (B) or (C), answer question 2.)

## II. AS TO THE ALLEGED SUPPLIER–DEFENDANTS

2. Was this plaintiff exposed at his place of employment to asbestos fiber supplied by any or all of the following defendants?

| | | |
|---|---|---|
| Carey-Canadian Mines | YES ____ | NO ____ |
| Asbestos Corp. Ltd. | YES ____ | NO ____ |
| Johns-Manville | YES ____ | NO ____ |
| North American Asbestos | YES ____ | NO ____ |
| Bell Asbestos | YES ____ | NO ____ |

(As to any defendant you answer "yes" to, answer question 3; as to any defendant you answer "no" to, answer no more questions.)

3. As to those defendants you answered "Yes" to in question 2, was the asbestos to which this plaintiff was exposed in a defective condition by reason of the absence of any warning as of the time it left the control of such defendant?

| | | |
|---|---|---|
| Carey-Canadian Mines | YES ____ | NO ____ |
| Asbestos Corp. Ltd. | YES ____ | NO ____ |
| Johns-Manville | YES ____ | NO ____ |
| North American Asbestos | YES ____ | NO ____ |
| Bell Asbestos | YES ____ | NO ____ |

(As to any defendant you answer "yes" to, answer question 4; as to any defendant you answer "no" to, answer question 5.)

4. As to those defendants you answered "Yes" to in question 3, was such defect (absence of warning) a proximate cause of the plaintiff's asbestos-related condition?

| | | |
|---|---|---|
| Carey-Canadian Mines | YES ____ | NO ____ |
| Asbestos Corp. Ltd. | YES ____ | NO ____ |
| Johns-Manville | YES ____ | NO ____ |
| North American Asbestos | YES ____ | NO ____ |
| Bell Asbestos | YES ____ | NO ____ |

(Answer question 5.)

5. As to any of the following defendants, was its conduct in failing to provide a warning "negligent"?

| | | |
|---|---|---|
| Carey-Canadian Mines | YES ____ | NO ____ |
| Asbestos Corp. Ltd. | YES ____ | NO ____ |
| Johns-Manville | YES ____ | NO ____ |
| North American Asbestos | YES ____ | NO ____ |
| Bell Asbestos | YES ____ | NO ____ |

(As to any defendant you answer "yes" to, answer question 6; as to an defendant you answer "no" to, answer question 7.)

6. As to any defendant you answered "Yes" to in question 5, was that negligence a proximate cause of plaintiff's ultimate asbestos-related condition?

| | | |
|---|---|---|
| Carey-Canadian Mines | YES ____ | NO ____ |
| Asbestos Corp. Ltd. | YES ____ | NO ____ |
| Johns-Manville | YES ____ | NO ____ |
| North American Asbestos | YES ____ | NO ____ |
| Bell Asbestos | YES ____ | NO ____ |

(Answer question 7.)

7. Did this plaintiff knowingly and voluntarily assume the risk of harm to himself? YES ____ NO ____

(Answer question 8.)

8. If your answer to question 7 is "Yes," was this plaintiff's assumption of risk a proximate cause of his asbestos-related condition? YES ____ NO ____

(Answer question 9.)

9. Was this plaintiff contributorily negligent in respect to his acquiring an asbestos-related condition? YES ____ NO ____

(If you answer "yes," answer question 10; if "no," answer question 11.)

10. Was this plaintiff's contributory negligence a proximate cause of his asbestos-related condition? YES ____ NO ____

(Answer question 11.)

11. (Answer this question *only* if your answers to questions 2 and 3 and 4 as to defendant Johns-Manville are "yes.")

Should defendant Johns-Manville be liable to this plaintiff for punitive damages in addition to any compensatory damages the plaintiff may be entitled to recover? YES ____ NO ____

---

III. AS TO PHILIP CAREY MANUFACTURING COMPANY (CELOTEX) ONLY

---

12. Did this defendant intentionally fail to warn this plaintiff at any time after October 1, 1963, that this plaintiff might have acquired an asbestos-related disease by reason of his exposure to asbestos during his employment at the Philip Carey Manufacturing Plant? YES ____ NO ____

(If your answer is "yes," answer question 13; if "no," answer question 15.)

13. Was this failure to warn a proximate cause of the asbestos-related condition that this plaintiff ultimately experienced? YES ____ NO ____

(If your answer is "yes," answer question 14; if "no," answer question 15.)

14. If by reason of your answers to questions 12 and 13 defendant Philip Carey Manufacturing Company is found by you to be liable to this plaintiff for compensatory damages, should this defendant also be liable for punitive damages in addition to any compensatory damages this plaintiff may be entitled to recover?
YES ____ NO ____

15. Was the conduct of Philip Carey Manufacturing Company after October 1, 1963, a superceding cause of any compensatory damages any of the below-named defendants may be liable to this plaintiff for after October 1, 1963?

| | | |
|---|---|---|
| Carey-Canadian Mines | YES ____ | NO ____ |
| Asbestos Corp. Ltd. | YES ____ | NO ____ |
| Johns-Manville | YES ____ | NO ____ |
| North American Asbestos | YES ____ | NO ____ |
| Bell Asbestos | YES ____ | NO ____ |

---

/s/ Foreperson of the Jury

## APPENDIX B

The following interrogatories were submitted to the jury by the Court with respect to each individual plaintiff during the damage trials:

VERDICT OF THE JURY AS TO DAMAGES — Civil Action No. 78–4242

Plaintiff: _____

### COMPENSATORY DAMAGES

1. This plaintiff is awarded compensatory damages in the sum of:
$_____

2. By what percentage should the intentional conduct of Philip Carey, by its failure to warn this plaintiff after October 1, 1963, contribute to the compensatory damages you have awarded to this plaintiff in Question 1?
_____%

### PUNITIVE DAMAGES

3. This plaintiff is awarded punitive damages against Johns-Manville Corporation in the sum of: $_____

4. This plaintiff is awarded punitive damages against Celotex Corporation, successor to Philip Carey Manufacturing Company, in the sum of:
$_____

### LOSS OF CONSORTIUM

5. Damages for loss of consortium are awarded to the wife of this plaintiff in the sum of: $_____ [1]

_____

/s/ Foreperson of the Jury

[1] The loss of consortium question was not submitted to the jury in the damages trials of plaintiffs Judy Simpson, Administratrix of the Estate of Arnold Foulke, and Nathaniel Satterwhite. In the case of Louis Romano, the Court substituted the following interrogatory for the damages to be awarded to the wife:

WRONGFUL DEATH
5. Damages for wrongful death are awarded to the wife of this plaintiff in the sum of:
$